MELISSA BROWN *vs.* MARSHALL W. FRENCH.

Hampden.     Sept. 24. — Oct. 3, 1878.     AMES & SOULE, JJ., absent.

A testator, by his will, directed his executors to " use their own judgment as to in-
vesting the moneys arising from my estate ; at the same time I would recommend
to them the propriety of keeping at least one half of the same invested on mortgage
of unincumbered real estate, as I think well of that kind of security." When a
trustee of the estate was afterwards appointed, more than half of the trust fund
was invested in United States bonds, and none of it in mortgages of real estate.
The trustee, who had had experience in making investments for himself and
others, including banks in which he was an officer, sold the United States bonds,
and invested the greater part of the proceeds in railroad bonds at eighty-five per
cent. of their par value, and in a promissory note of an individual secured by
pledge of twice its amount of such bonds, after having advised with various persons
reputed of good judgment in financial matters, and after having himself made care-
ful inquiries and investigations, the result of which was to satisfy his mind that
the investments were safe and prudent ones at the time, and were proper for him
to make in his capacity as trustee. The bonds were payable in gold in twenty
years, or at the option of the obligor after five years, with interest coupons at-
tached payable semiannually in gold at six per cent., and were secured by a first
mortgage upon the franchises and property of three railroad corporations out of
this Commonwealth, the whole of whose stock had been actually paid in, in cash,
and was equal in amount to the whole of the bonds which had been sold by the
trustees to which they were originally issued, and whose roads formed part of a
continuous and direct line from Portland in the State of Maine to Ogdensburg
in the State of New York, and formed a line of one hundred and twenty-five miles
in the State of Vermont, half of which was already complete and in operation,
and the rest of which was in the course of completion under very favorable con-
tracts. At the time of the investment, the roads were in the management of men
who possessed in a high degree the confidence of the community for integrity
and business ability ; and the bonds were selling in the market at from eighty to
ninety per cent. of their par value, and were regarded as a first class investment,
and were purchased by persons of reputed good judgment for permanent invest-
ment. The bonds subsequently depreciated greatly in value. *Held*, that the trus-
tee acted with the sound discretion that the law required of him, and should not be
charged with the loss.

APPEAL from a decree of the Probate Court, allowing the ac
count of Marshall W. French as trustee under the will of James

Dimmick. Hearing before *Ames*, J., who reported the case for the consideration of the full court as follows :

The appellant objected to two investments allowed by the Probate Court, one of $14,100 invested in Portland and Ogdens- burg Railroad bonds, and one of $5500 invested in the promissory note of H. Fairbanks, chairman, secured by such bonds pledged as collateral security to twice the amount of the note.

The will of James Dimmick, dated July 12, 1858, contained the following clause : " I order that my executors use their own judgment as to investing the moneys arising from my estate ; at the same time I would recommend to them the propriety of keeping at least one half of the same invested on mortgage of unincumbered real estate, as I think well of that kind of security." At the time of the appointment of French as trustee, the trust estate amounted to $40,605.90 personal estate, and $2580 real estate ; and at that time the personal estate was invested in sundry stocks and personal securities, $25,500 being invested in United States bonds, $1000 in state bonds, $13,000 in various city bonds, and no part of it being invested in mortgages of real estate.

In January, 1870, the trustee exchanged $1500 of United States bonds for six per cent. Pacific Railroad bonds. In June, 1871, he sold $13,000 of the United States bonds for cash at $112⅔, and during the same month he sold $1000 more of the same at $112⅝ for cash. In April, 1872, he invested $2000 in the Portland and Ogdensburg Railroad bonds. In the summer and fall of 1872, some of the government bonds of the same issue as those held by the trustee were called in for redemption, and the trustee, apprehending that the rest would be called for soon, in November, 1872, sold $10,000 of the United States bonds for cash at $114⅝ and invested the proceeds in Portland and Ogdensburg Railroad bonds.

These bonds were the joint promises to pay of three railroad corporations organized in the State of Vermont, namely, the Essex County, the St. Johnsbury and Montpelier, and the Lamoille Valley, which were built and operated under one management, and extended in a continuous line from Lunenburg upon the Connecticut River to Swanton upon Lake Champlain, and together constituted what was called the Vermont division of the

Portland and Ogdensburg Railroad, a line made up of different corporations extending from Portland in the State of Maine to Ogdensburg in the State of New York. The bonds were sometimes, and more properly, called the joint first mortgage bonds of the Lamoille Valley, Montpelier and St. Johnsbury, and Essex County Railroad companies. They were secured by a first mortgage upon the franchises, road-beds, tracks, rolling stock and tools of all three railroad corporations, were dated May 1, 1871, and were payable in gold coin in twenty years from date, and at the option of the corporations after five years from date, with semiannual interest coupons attached at six per cent., payable also in gold coin. These three railroads were together about 120 miles long, and their capital stock actually paid in in cash was from $10,000 to $12,000 per mile on the average. They passed through a good section of the state for local business, which had before been without railroad facilities; and they connected at Swanton with the Vermont and Canada Railroad, and thence by way of Rouse's Point and Ogdensburg with a through line to the West; at Lunenburg they connected with the Maine and New Hampshire division of the Portland and Ogdensburg Railroad, then in process of construction, and upon completion of this latter line, (which has since been completed,) they would form a part of the shortest line between the seaboard and the great lakes; a line with very favorable grades for the transportation of freight, and promising to be a favorite route for pleasure travel. About sixty miles of the line in Vermont, being a portion of the whole of each of the three roads, was completed and in operation at the beginning of 1873, and a very considerable portion of the grading on the rest of the line, nearly or quite one half, was done at that time. The three roads were built under one management, and were all contracted for in 1873 under very favorable contracts. The entire issue of bonds secured by the mortgage was $2,300,000. They were all issued to the trustees in the summer of 1871, and from $1,300,000 to $1,400,000 of them had been sold when the financial panic of 1873 stopped their sale at what were considered proper prices, and the balance have not been sold.

French had had experience in making investments for himself, also as treasurer of a savings bank in the town of Palmer, and

as president of a national oank in Palmer. In the latter part of 1871, he purchased Portland and Ogdensburg Railroad bonds for Samuel A. Hitchcock, of Brimfield, to the amount of $83,000, and soon afterward $17,000 more, with which he endowed scholarships at Amherst College. Before purchasing the first lot of such bonds as trustee in April, 1872, he consulted with Hitchcock, and also with the treasurer of Monson Academy, who held some of the bonds, and also with members of the firm of Fairbanks & Co., financial agents for selling the bonds, and with Fairbanks, Brown & Co. and Brewster, Sweet & Co. of Boston, who were agents for selling the bonds of the New Hampshire and Maine division of the Portland and Ogdensburg Railroad line, all of whom recommended the investment, and all of whom were persons of reputed good judgment in financial matters, and in whose integrity he confided. Before buying the second lot of bonds in November, 1872, he again examined the condition of the road, procured an autograph letter from the engineer of the three roads, giving particulars about them in detail, and again consulted with the above persons and with numerous others; and the result of all his inquiries and investigations was to satisfy his mind that the investment was a safe and prudent one at the time.

The roads were in the management of men who possessed in a high degree the confidence of the community for integrity and business ability; and in 1872 the bonds were selling from eighty to ninety per cent. of their par value, according to the size of the lots sold, were regarded as a first-class investment, and were purchased, by persons of reputed good judgment, for permanent investment. French paid for the bonds eighty-five per cent. of their par value; but at the time of the hearing, and for a long time before, they had very largely depreciated, and were offered for sale at from one fifth to one quarter of their cost, no purchasers being found. There was also evidence that within the last two years no more than ten per cent. of their par value was offered in the market. It appeared that interest had not been paid on the bonds since 1875. The note of Fairbanks was for a loan made in November, 1873, and was originally for $11,000, payable on demand to the order of H. Fairbanks, chairman, and indorsed by him with interest at ten per cent., and secured by

such bonds to the amount of $22,000 at their par value. On February 2, 1875, $5500 was paid on the note, and one half of the collateral was surrendered.

The trust fund, at the time of the allowance of the account objected to, amounted to about $60,000, of which only $2150 were invested in a mortgage of real estate, and none in bonds of the United States.

It was not charged by the appellant that, in the management of the funds in his hands, the trustee had any dishonest or fraudulent intent; and it was proved and conceded that, in making the investments objected to, he honestly and in truth believed that they were safe and proper investments for him to make, in his capacity as trustee. Whether in so doing he acted with the sound discretion which the law requires of a trustee, (taking into consideration the position and character of the funds as he received them, the recommendation expressed in the will, the character and prospects of the corporation in whose bonds he invested, and generally the time and circumstances of the case,) was a question upon which the judge had doubts, and reserved the case for the consideration of the full court. If, upon the facts reported, it was not an act of reasonable and sound discretion, on the part of the trustee, to make the investment complained of, under the circumstances and in the manner above set forth, then his account was to be disallowed, corrected or modified, as law and justice should require.

*H. Morris & A. M. Copeland*, for the appellant. 1. The trustee should have reasonably regarded the recommendation of the testator to keep at least one half of the funds invested on mortgage of unincumbered real estate. *Harvard College* v. *Amory*, 9 Pick. 446, 462. Perry on Trusts, § 452.

2. A trustee is bound to act in good faith, and also to exercise a sound discretion, in his investments of the trust property. *Doyle* v. *Blake*, 2 Sch. & Lef. 230. *Clark* v. *Garfield*, 8 Allen, 427. *Kimball* v. *Reding*, 11 Foster, 352. *Freeman* v. *Cook*, 6 Ired. Eq. 373. He failed to exercise such discretion when he sold government bonds and invested the proceeds in railroad bonds. *Mortimore* v. *Mortimore*, 4 De G. & J. 472. Willis on Trustees, 125, 184. Investing in bonds of an unfinished rail road is but an adventure; and is contrary to the plain duty of

a trustee. *Kimball* v. *Reding, ubi supra. Pray's Appeals,* 34 Penn. St. 100.

3. The case at bar differs from *Harvard College* v. *Amory,* 9 Pick. 446, and from *Lovell* v. *Minot,* 20 Pick. 116. In the first case, the investment of trust funds in the stock of a manufacturing company was sanctioned by the testator and by the terms of the will, and it was an investment in stock which was paying an income. In the second case, the investment was not in the stock of a manufacturing company, but the trustee took the stock as collateral security, with a large margin in his favor, to secure the payment of the promissory note of a person of good credit.

*M. P. Knowlton & S. S. Taft,* for the appellee.

GRAY, C. J. In the leading case of *Harvard College* v. *Amory,* 9 Pick. 446, the testator directed his trustees to lend the trust fund upon ample and sufficient security, " or to invest the same in safe and productive stock, either in the public funds, bank shares or other stock, according to their best judgment and discretion, hereby enjoining on them particular care and attention in the choice of funds, and in the punctual collection of the dividends, interest and profits thereof, and authorizing them to sell out, reinvest and change the said loans and stocks from time to time, as the safety and interest of said trust fund may in their judgment require." The court, in a thoroughly considered opinion, delivered by Mr. Justice Putnam, held that the trustees were authorized to invest in stocks of manufacturing corporations or incorporated insurance companies; and, after observing that the English rule, which requires trustees to invest in public funds only, had never been recognized here, laid down this general rule : " All that can be required of a trustee to invest is that he shall conduct himself faithfully and exercise a sound discretion. He is to observe how men of prudence, discretion and intelligence manage their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income, as well as the probable safety of the capital to be invested." 9 Pick. 461.

The rule thus judicially declared nearly half a century ago has been since constantly adhered to in this Commonwealth, and has been applied to cases in which the terms of the trust contained no special provisions upon the subject. *Lovell* v.

*Minot*, 20 Pick. 116. *Kinmonth* v. *Brigham*, 5 Allen, 270, 277. *Clark* v. *Garfield*, 8 Allen, 427. If a more strict and precise rule should be deemed expedient, it must be enacted by the Legislature. It cannot be introduced by judicial decision without working great hardship and injustice.

In the case before us, the testator expressly gave his trustees the largest discretion to use their own judgment as to investing the trust fund. While he recommended to them the propriety of keeping at least one half thereof invested on mortgage of real estate, he did not command them to do so, and in fact no part of the fund was so invested at the time of the appellee's appointment. The investments objected to were in Portland and Ogdensburg Railroad bonds at eighty-five per cent. of their par value; and in a promissory note of an individual, secured by pledge of twice its amount of such bonds. The question of the lawfulness and fitness of the investments is to be judged as of the time when it was made, and not by subsequent facts which could not then have been anticipated.

The circumstances existing at that time are fully stated in the report, and may be summed up as follows: These bonds were payable in gold in twenty years, or at the option of the obligor after five years, with coupons attached for the payment in gold of interest semiannually at six per cent., and were secured by a first mortgage upon the franchises and property of three railroad corporations, the whole of whose stock had been actually paid in in cash and was equal in amount to the whole of the bonds which have been sold by the trustees to whom they were originally issued, and whose roads formed part of a continuous and direct line from Portland in the State of Maine to Ogdensburg in the State of New York, and themselves formed a line of about a hundred and twenty miles in the State of Vermont, half of which was already complete and in operation, and the rest of which was in the course of completion under very favorable contracts. The roads were in the management of men who possessed in a high degree the confidence of the community for integrity and business ability; and the bonds were selling in the market at from eighty to ninety per cent. of their par value, according to the size of the lots sold, and were regarded as a first-class investment, and were purchased, by persons of reputed good judgment, for perma

nent investment. The appellee had had experience in making investments for himself and others, including banks in which he was an officer, and made the investments now in question after advising with various persons reputed of good judgment in financial matters, and after himself making careful inquiries and investigations, the result of which was to satisfy his mind that the investments were safe and prudent ones at the time.

Neither the fact that the whole line of railroads was outside this Commonwealth, nor the fact that the money applied to this investment was derived from the sale of bonds of the United States, is sufficient to control the effect of the other facts reported.

The appellant does not charge any dishonest or fraudulent intent on the part of the appellee, but concedes that, in making the investments objected to, he honestly and in truth believed that they were safe and proper investments for him to make in his capacity as trustee. Upon the only question reserved (which is a question of fact rather than of law) we do not share the doubts of the justice of this court before whom the hearing was had, but are clearly of opinion that, under all the circumstances stated in the report, the trustee acted with the sound discretion that the law required of him.

*Decree of Probate Court affirmed.*