## Carwithen's Estate

Before Van Dusen, Stearne, Sinkler, Klein, and Bok, JJ.

*Saul, Ewing, Remick & Saul,* for petitioners.

*Morgan, Lewis & Bockius,* and *Pepper, Bodine, Stokes & Schoch,* for intervenor.

*Henry S. Drinker, Jr.,* amicus curiae.

*Lloyd J. Schumacker,* guardian ad litem.

BOK, J., February 11, 1937.—This is a petition for a declaratory judgment.

We have decided to grant it, for the ripening seeds of controversy are present, the question is one of which this court has jurisdiction, all persons interested are represented, and our opinion will be a practical help in ending the controversy: Kariher's Petition (No. 1), 284 Pa. 455.

The general question to be decided is one of fundamental importance to fiduciaries, and arises in two companion cases, of which this is one. The other is Donovan's Estate, 28 D. & C. 93 and petitions for a declaratory judgment were filed simultaneously in both. It is this: May a fiduciary purchase with trust funds common and preferred stocks of corporations where the instrument appointing him says he may make investments or buy securities, without confining him to what are known as legal investments or securities?

The problem divides for solution into two parts. The first is: Has the fiduciary been freed by the appointing instrument from the restrictions of the Legal Investment Act? The second, assuming that he has been freed, is: To what extent may he go thereafter without automatically incurring liability in case of loss? The first is a matter of construction in which only the specific instrument is concerned. The second is a mixed matter of construction and law, for the instrument must be regarded in order to determine whether it contains a restriction of its own, and the general law must be consulted to see whether any principle of the corpus juris applies.

## The Carwithen will

Van Court Carwithen died on November 13, 1927. His will, dated December 29, 1925, was duly proved. By it he gave a third of his estate to his wife. The remaining two thirds he placed in trust, from which a certain income was to be paid to his mother for life and the balance of income to his children equally for their lives. Upon their death with issue, their share of principal was to go to such issue, and, if both his children died without issue, then over collaterally to testator's maternal aunts and uncles or their descendants, per stirpes. Each of his children dying without issue had the right to appoint to her surviving husband one half of such child's life income. All shares of principal and income are protected by a spendthrift provision.

Testator left two daughters, both of age: one is unmarried and has no issue, while the other is married and has one child. Testator's mother died in 1932. The widow survives, but has no interest in the trust fund, as she elected to take under the will.

By adjudication of Judge Van Dusen dated November 7, 1928, the balance of principal was $757,009.81, of which two thirds, or $494,442.52, was awarded to the present trustees.

Of the full share turned over to the trustees, only $1,523.60 was in cash. The rest was composed of liberty bonds, farm loan bonds, bonds of foreign governments, bonds of private corporations, such as railroads, theaters, power, light and gas companies, bonds of individuals secured by mortgages on real estate, mortgages, and preferred and common stocks of telephone, automobile, manufacturing, oil, railroad, and gas companies. There was also a part interest in a note for $100 given by an individual.

The trustees' power to handle this array is as follows:

"With power in my Executors and Trustees to exercise any or all the powers following:

"1. To sell any real estate which may at any time form part of my estate, for such prices, upon such terms, in such way and manner and for such interests and estates, as may be deemed wise, and to make good deeds therefor to the purchasers thereof, without any obligation on the latter to see to or be responsible for the application of the purchase money.

"2. To let on ground rent, release or extinguish the same, wholly or partially, whether by reduction of the amount of rent to be paid or otherwise; to mortgage, square, exchange or join in the partition of, real estate, and to let or demise the same.

"3. To invest and reinvest, alter, vary and change investments and reinvestments from time to time, at discretion, without confining my Trustees to what are known as Legal Investments. I authorize my Trustees, in their discretion, to retain without liability, any of my investments in the form in which they may be at the time of my decease.

"4. To repair, alter, lease or improve any real estate or other property.

"5. To purchase investments at a premium and to charge the premium over to principal or income, or partly to principal and partly to income, as they shall deem best.

"6. To exercise any option to subscribe for new stocks or bonds or certificates, or other instruments in the nature thereof, which may be given to them as the holders of any stocks or bonds or certificates, or other instruments in the nature thereof, belonging to my estate.

"7. To join in any plan or lease, mortgage or consolidation, exchange, reorganization or foreclosure of any corporation in which my estate may hold stocks or bonds or other securities, and to deposit such stocks, bonds or other securities under such plan.

"8. To borrow money from time to time and at any time and in such amounts and for such purposes as my Executors and Trustees or the survivor of them may deem necessary and advisable, with power to pledge as col-

lateral security for the payment of such loans such portion of the assets of my estate as may be necessary, and with like power from time to time to renew and extend such loans."

This will, read from its four corners, evidences a strong desire on testator's part to care for his own family and to allow his personal representatives a free hand in managing his estate.

We therefore hold, under authorities to appear later, that this will gives the fiduciaries complete discretion as to "investments".

We must now decide whether testator intended the word "investments" to include common and preferred stocks.

We feel that he himself has provided ground on which to base an interpretation of the word, as it relates to stocks. It appears in section 41 of the Fiduciaries Act of June 7, 1917, P. L. 447, and its meaning there is obvious.

Both testator and the legislature must refer to the same process when they say "to invest", and to the same result of that process when they say "investment". As testator expressly permits his trustees to retain any of his "investments", he must have considered all of his assets as "investments". Since these include both common and preferred stocks, the term must apply to them by testator's own reference. Furthermore, as he also expressly permits his trustees to invest and reinvest, alter, vary and change investments and reinvestments, it must follow that the process of investing applies to the class of assets to which he has referred: Merrell's Estate, 25 Dist. R. 323.

Testator then empowers his trustees to exercise options to subscribe for "new stocks or bonds or certificates, or other instruments in the nature thereof", and repeats this phrase later. He also allows them to join any plan "of any corporation in which my estate may hold stocks or bonds or other securities". This enumeration must fall within the reach of the general term "investments", over which the discretionary power was first given.

We conclude that testator's intention was to permit his trustees to buy stocks in managing his trust estate.

Whether this consequence will ensue in every case where the word "investments" appears in a will or deed of trust, depends, of course, on the context of the particular instrument and on the use of the word. The word "investments", however, has a meaning of its own in both lay and legal language. It is not a word of art, like "issue", which is met only in legal society, and certainly the man in the street refers to stocks and bonds when he says "my investments".

Its etymological meaning is derived from the Latin "investire", to clothe with, and is so used by Shakespeare, without invidious comparisons, let it be hoped, in Hamlet:

"Doe not beleeve his vowes; for they are Broakers,
Not of the eye, which their Investments shows:
But meere implorators of unholy Sutes,
Breathing like sanctified and pious bonds,
The better to beguile."

The Oxford Dictionary defines its modern connotation as follows:

"b. The conversion of money or circulating capital into some species of property from which an income or profit is expected to be derived in the ordinary course of trade or business.

"Distinguished from *speculation,* in which the object is the chance of reaping a rapid advantage by a sudden rise in the market price of something which is bought merely in order to be held till it can be thus advantageously sold again. . . .

"c. An amount of money invested in some species of property; also, a form of property viewed as a vehicle in which money may be invested."

Bouvier's Law Dictionary adds the apt thought that whenever a sum is represented by anything but money it is invested, quoting from People ex rel. v. The Commissioners of Taxes of the City of N. Y., 23 N. Y. 242.

It is unnecessary to labor the definition of the word, for it has judicial interpretation in Pennsylvania. In Neel v. Beach, 92 Pa. 221, the court said:

"If stress be put on the word invest, one of its senses is, 'to surround with or place in, as property in business'; another, 'to place so that it will be safe and yield a profit'; though it is commonly understood as giving money for some other property. It is not difficult to construe these provisions so both may have effect, and when that can be done the rule is, it shall be."

In Tower's Estate, 253 Pa. 396, the court said:

"The shares of the capital stock of the Fidelity Trust Company held by the testator at the time of his death were an investment made by him".

In Brown's Estate, 287 Pa. 499, the court said:

"Investments in stocks, or bonds are a means by which money is made to earn for itself money or income."

Under section 227 of the A. L. I. Restatement of Trusts, there appears this comment on clause (u) :

"A provision in the terms of the trust authorizing the trustee to invest in 'securities' is ordinarily interpreted as broad enough to include not merely secured obligations *but also other investments such as shares of stock or debentures."* (Italics ours.)

We conclude that the will frees the trustees from the restrictions of the Legal Investment Act, and that the word "investment" not only inherently includes stocks, but was so intended by testator. There is, therefore, no reason to be found in the will why the trustees may not admit them to the trust portfolio.

This leaves the most important question in the case, namely, whether the law imposes any restriction of its own, apart from the language of the will. The guardian ad litem asserts that it does, and that fiduciaries may not buy stocks unless the instrument expressly authorizes it. He argues that the investment field is divided, like Gaul, into three parts: first, legals; second, bonds; third, what he calls the black abyss of equities and personal obligations. He contends that, piecing the authorities together, our law has built up a group of general equitable princi-

ples which place a limit after the second class, and that no fiduciary, however free under his instrument, may leap into the third class without becoming an insurer. His reason for placing the barrier at this point is that these general equitable principles imply the notion of "security", in its technical legal sense of "loan", as an indispensable element in any nonlegal investment. Since stocks have no such "security", he contends, they are automatically excluded as permissible investments.

There has been a series of Legal Investment Acts: February 18, 1824, 8 Sm. L. 194; March 29, 1832, P. L. 190; April 13, 1854, P. L. 368; May 8, 1876, P. L. 133; June 7, 1917, P. L. 447; July 2, 1935, P. L. 545. None of them is mandatory, although no fiduciary is safe unless he considers them so.

The legislative and judicial history of this question divides into two parts, following generally the great economic periods of the country. The first is from 1824 to 1874, when the new Constitution was adopted. During this time judicial disapproval of stocks as investments was at full flood. With the example of England shadowing rather than guiding our country, we paid improper attentention to many of her problems and to her solutions of them, believing, likely enough, that time had isolated them by the habit of centuries. When feudal England emerged from the Reformation as an industrial Nation, men behaved as men do with a new freedom. While the colonies were laboring and then winning their independence, the English public was being invited to take stock in a series of incredible frauds—the South Sea Bubble, making gold from sea water, running slaves from Africa, for example. Little wonder that the English rule was narrow—only the public debt and real estate were proper for trust investments.

We did not reach this point of clarity, at least in Pennsylvania, with the result that there is no decision foursquare with the problem. There is a group of cases dealing with parts of it, most of them passing upon specific

investments, some interpreting the meaning of discretion. The latter are of more help to us, for they indicate that discretion means discretion. Fiduciaries would not be in their present quandary had we held, as the English did in Trafford v. Boehm, 26 Eng. Repr. 1054, 3 Atk. 440 (1746), that discretion given in a will did not permit fiduciaries to venture beyond the field of legal investments, or had we clearly recognized a modern rule to the contrary, as the English did in In re Rayner, 1 Ch. Div. 176 (1904). In their times, both rules were needed in both countries.

We did some wildcatting on our own account in this country, and it left its mark. Pioneering in frontiers was good for the growth of the Nation, but pioneering in investments was not good for estates and beneficiaries, and the young corporations that sprang up in the wake of Fulton's steamboat, the Iron Horse, and the mine pits of the West were suspect, and properly so.

It is during this period that we find cases like Worrell's Appeal, 9 Pa. 508, in which the court calls attention to the rage for speculating in stocks which was then sweeping the Nation, Hemphill's Appeal, 18 Pa. 303, and Pray's Appeals, 34 Pa. 100, all decided between 1848 and 1859, and containing some rather fierce expressions. Thus, in Hemphill's Appeal, supra:

"It has never been doubted anywhere, that a loss which accrues of a trust fund, invested on personal security, must be borne by the trustee. Is the stock of a banking, manufacturing, and trading corporation any better? Certainly not".

Pray's Appeals is the sharpest critic of stock investments and is the first case in which we meet discretion given in the will. The trustee exercised it by investing in the stock of an oil company and was surcharged because the company had no investment characteristics whatever: there was no security of principal, no income or even the prospect of any, and the whole enterprise was an untried and unfinished experiment. Yet the Supreme Court was

not willing to lay down a general rule regarding stocks, for it said, page 112:

"It is not necessary in this case to decide whether, where a discretion is left, the trustee should always adhere to the securities pointed out by the Act of Assembly; but we must say that we think it the safest and wisest course."

It should be remembered that during this period there was in effect the Act of April 7, 1849, P. L. 563, entitled "An Act to encourage manufacturing operations in this commonwealth", section 17 of which read: *"Provided, That nothing herein contained shall be construed as authorizing investment by trustees, executors or guardians in such stock."*

In 1873 the Debates of the Constitutional Convention show the prevailing attitude. Between 1832 and 1873 various acts had been passed, permitting investment in bonds of a few counties and in the bonds of the Reading and Pennsylvania railroads. From volume 5 of the Debates, between pages 293 and 308, the following excerpts are of interest. Said Mr. Boyd, on page 298:

"This proposition of mine, if adopted, will bring us back to the good and safe times when we all knew that trust funds were only invested in ground rents and first mortgages upon real estate, and all this legislation that we have had from time to time authorizing the investment of such funds in State bonds, city bonds, borough bonds, railroad bonds, and the like, have been innovations upon the time-honored custom of confining investments to first ground rents and mortgages."

Stocks were rarely mentioned, and then with horror or confusion. Note what Mr. Biddle says of them, on page 305:

"What remedy have you got in regard to a private corporation? Does not everybody know that the stock and bond stand almost literally upon the same basis? As the one goes up or down, so does the other; and you always have a perfectly fair index of the value of the mortgage

bonds by the price the stock is bringing in the market. . . . What sort of a security is that for a trustee"?

In the temper and condition of the times which then prevailed, the following provision was inserted in the Constitution of 1874 as article III, sec. 22:

"No Act of the General Assembly shall authorize the investment of trust funds by executors, administrators, guardians or other trustees, in the bonds or stock of any private corporation".

Other cases decided within the period of which we are speaking are: Nyce's Estate, 5 W. & S. 254 (1843); Twaddell's Appeal, 5 Pa. 15 (1846); Rush's Estate, 12 Pa. 375 (1849); Angue's Estate, 2 Phila. 221 (1856).

The second period begins with the new Constitution of 1874. By Act of May 8, 1876, P. L. 133, the legislature extended the field of legal investments to include municipal and county bonds.

Following the period of Reconstruction, American industry changed radically. Companies which had been small and untried grew to such power and influence that they dominated politics and even government; the political history of the Southwest, for example, is practically the history of the Santa Fe Railroad. Science began to unleash forces which might better have been undiscovered until man had evolved a greater cenobitic intelligence. Stocks seasoned in an expanding market, while their companies survived a series of depressions and emerged stronger than ever. In 30 years automobiles and electricity became necessities which changed the face of the Nation. The stock exchange began to react to news in Australia or Cape Town within an hour of its happening. By 1917 there was a new world of economics and industry.

Its effect upon the courts was inevitable. The cases, inter lineas, became less critical of stocks. They did not definitely approve them, but they naturalized the conception of a fiduciary's discretionary powers. For instance, in Bartol's Estate, 182 Pa. 407 (1897), discretion was given broadly, in terms not dissimilar to those in the

Carwithen will, although the trustee was limited to real estate and bonds. The court said, page 415:

"The investment, therefore, now in question, is not to be governed either by the limitations imposed by the Pennsylvania statute, or by any other test than that which is exacted by the will."

In 1917 the drafters of the Fiduciaries Act made this comment:

"The Commissioners believe that the powers of investment granted to fiduciaries under the present law are too greatly restricted and that their enlargement would be welcomed throughout the State . . .

"The Commissioners would be willing to recommend a more extensive act were it not for the Constitution, which in art. III, section 22, would seem to prohibit the legislature from authorizing an investment in the bonds or stocks of a private corporation."

In Detre's Estate, 273 Pa. 341 (1922), the will gave full discretionary language, and the court said at pages 345, 350:

"Where, as here, a trustee is clothed with discretionary powers as to investments and reinvestments, neither the state constitutional provision as to trust funds, nor the rule as to legal investments, applies: Barker's Est., 159 Pa. 518; Cridland's Est., 132 Pa. 479, 484. . . .

"All that a court of equity requires from a trustee is common skill, common prudence and common caution, and he is not liable when he acts in good faith as others do with their own property: Semples' Est., 189 Pa. 385; Wood's Est., supra; Neff's App., 57 Pa. 96. Furthermore, a trustee will not be held personally liable for an honest exercise of a discretionary power, in the absence of supine negligence or wilful default (Bartol's Est., 182 Pa. 407; Chambersburg Saving Fund Association's App., 76 Pa. 203, 227)".

In 1933 (P. L. 1558), section 22 of article III of the State Constitution was amended to read:

"The General Assembly may, from time to time, by law, prescribe the nature and kind of investments for

trust funds to be made by executors, administrators, trustees, guardians and other fiduciaries."

By the Act of July 2, 1935, P. L. 545, the field of legal investments was extended to include the bonds of certain private corporations, under conditions.

Other cases which were decided within the period we have just been discussing are: Pleasants' Appeal, 77 Pa. 356 (1875); Barker's Estate, 159 Pa. 518 (1894); Hart's Estate (No. 1), 203 Pa. 480 (1902); Commonwealth ex rel. v. McConnell, 226 Pa. 244 (1910); Tower's Estate, supra; Taylor's Estate, 277 Pa. 518 (1923); Brown's Estate, supra; Dempster's Estate, 308 Pa. 153 (1932); and the following lower court decisions: by Judge Anderson in Merrell's Estate, 25 Dist. R. 323 (1916); by Judge Gest in Edwards' Estate, 6 D. & C. 121 (1925); by Judge Holland in McVitty's Estate, no. 29111 of the Orphans' Court, Montgomery County, as yet unreported.

A careful study of the acts of assembly and the cases mentioned above convinces us that they do not support the contention of the guardian ad litem. The consensus of instinct which we gather from them is that discretion means no less than its original connotation of separation and discernment, that the gift of it implies the power to exercise those faculties, and that the only equitable principles which apply are those that are inherent more in the conception of fair dealing and careful acting than in the nature of any particular type of investment. We find no body of equitable principles which expressly excludes stocks from discretion clearly given. Fiduciaries are always bound by the established rules of due care and prudence, and their judgment must be subject to the minute and strict review of the courts. These rules bind them when they make a "legal investment", for they cannot heedlessly invest in a bad mortgage and escape liability merely because it is "legal". But where they have discretion and invest in stock after careful and prudent investigation, we do not feel that they should be held liable, as insurers, in case of loss.

We cannot prescribe here the exact paths to be investigated. In general, fiduciaries must act as ordinarily prudent men act with their own property, and what is prudent depends on the circumstances of each case.

Nor can we prescribe which stocks fiduciaries may purchase. We are permitting them merely to enter the field and choose wisely. The guardian ad litem contends that if we open the door to stocks we must logically open it to personal obligations, futures, and interests in "lesser breeds without the law". This does not follow. In whatever a trustee touches, he is governed by the rule of prudent investment. All that we pass on now is the right under this will to invest in corporate stocks, and we express no opinion beyond that. We have simply come to the conclusion that the modern stock market offers opportunities for investment substantially as safe as mortgages and bonds, and therefore admit corporate stocks within the discretion given in this will.

During the depression we have seen mortgages crash as badly as any equity in the black abyss. A third of Philadelphia's homes were foreclosed during five years, and, while the real estate on which they were secured did not blow away, mortgagees could often not hold properties on which arrears of taxes were due and which were sadly wanting for repair. There seemed to be no magic in mortgages.

We have also seen bonds issued by a company whose sole source of income was the dividends which it received as holder of a portfolio of stocks of other companies. These bonds were therefore secured by equities, and the argument to justify them was that the portfolio represented a broad base of diversified assets. In some cases, moreover, the bonds of the company at the top of the pyramid were secured by the stock of a second holding company, which paid to the first company dividends received in turn from the stock of a third company holding such a portfolio. There would seem to be no magic in bonds, as a class.

Many stocks have fared as well as many mortgages and bonds, and better. Certainly they offer a readier market, which is an element seriously to be considered. Many stocks have no mortgage or bond indebtedness ahead of them. It is difficult to see a strong argument why a trustee, protected as to discretion by the instrument and bound by the clear standard of due care and prudence, should not invest in the stocks of soundly managed companies which deal in commodities of fundamental need and importance, which have been seasoned and proved by experience, and which have written their record of stability into the fabric of American economic life. That these stocks will fluctuate in value is no such argument, for every investment, including Government bonds, fluctuates in value. We must think in terms of business cycles, of the return as well as of the ebbing of values, and of the cause for this. Fiduciaries cannot be put in a vacuum and set apart from other investors. They too must scan the turbulent horizon of our financial and industrial life and do the best they can. At times it may be safest to invest only in stocks, at others only in bonds or mortgages, at others only in Government obligations, and at others to hold the fund in cash.

It is no answer to say that legals and corporate bonds are subject to the fewest abuses and that experience has taught us the wisdom of continuing our faith in them exclusively. Experience has taught us nothing more than that it is wise and necessary to be careful. The field in which care may be exercised changes with the economic progress and temper of the country. Mr. Justice Holmes once said: "The life of the law has not been logic: it has been experience."

It is true that a stock, which is the evidence of ownership, does not possess the same technical security as a bond, which is the evidence of a loan. We feel that these differences should not bar stocks as an investment simply because they exist, but that they should be borne in mind. In view of the development of stock investing and its place

in the life of the country, the point is to decide the question not by the existence of these differences but by the quality of the investment. In short, this development has added to stock-investing the element of practical security as to both principal and income, which is afforded by ready marketability through the stock market and by the modern conception of the stability of industrial enterprise and the vitality of our economic system. In view of the Nation's experience in "loans" and "ownership", to say that we should hold to the one and despise the other is like choosing from which of two serious diseases we prefer to suffer.

To assert that the term "investment" implies the element of technical security is to make an assertion without proof. It is obvious that some sort of security must inhere in every investment, or it becomes speculation. The point to determine is what sort of security shall the courts require to justify an investment. In Pray's Appeals, supra, the interest of the beneficiary was held to demand "a present income with a *secured* principal." The history of the times and the temper of the law in 1859 would justify the inference that the word was then used in its narrow sense, requiring the public treasury or real estate as the ultimate source out of which the obligation would be paid. We feel that security can be found to exist within the structure and operation of modern industrial society: in corporations and their balance sheets, their business, their management, their record, and in the evolving complexion of the National economy. No longer can we say, arbitrarily, that it is related to one or two fields of activity alone. Furthermore, the principle of diversification adds another element of security to an investment portfolio.

This modern conception of security is not a labored one. It has been written into our statute books by recent legislation. The Securities Act of April 13, 1927, P. L. 273, amended by the Act of May 8, 1929, P. L. 1659, defines the terms "security" or "securities", in section 2, by saying that they include, among other things: ". . . any

certificate or instrument *representing or secured by an interest in the capital, assets or property of any corporation"*. (Italics ours.) The "secured principal" of Pray's Appeals, supra, would never have been interpreted by such language in 1859.

Clear words in a will should not be disregarded or rendered meaningless, nor should a testator's intention be lightly set aside: Bingaman's Estate, 281 Pa. 497. Where there is a restrictive act of assembly, and a testator says that his representative shall not be limited by it, we believe it is inescapable that the restriction of the act is completely removed. There remains the universal rule of due care and prudence, which affords beneficiaries a robust protection, and in addition to which the restrictive Legal Investment Act was created.

We do not feel that we are relaxing any rule which protects those who, as life tenants or remaindermen, are unable to help themselves. The law requiring legal investments takes hold if the will or deed is silent or if the discretion is not clearly given, as in Plate's Estate, 30 Dist. R. 902, and Garrettson's Estate, 23 Dist. R. 346, where a direction to invest "in good securities" or "in good secure manner" was properly held to emphasize the trustee's duty to invest in legals. Plate's Estate, supra, has been especially urged upon us, but it does not rule that stocks are not securities. It merely holds that the language used did not give the trustee power to go outside of legal investments.

The law in this State is more liberal toward a trustee who retains stocks which he received from the estate than toward a trustee who purchases them thereafter. Depending on the circumstances, he may even delay for years in selling them, and be held liable only for supine negligence: Stewart's Appeal, 110 Pa. 410; Dauler's Estate, 247 Pa. 356; Borell's Estate, 256 Pa. 523; Taylor's Estate, supra. There is little sense to this rule if the theory behind it is the same as the guardian ad litem urges upon us, namely, that stocks, as a class, do not offer sufficient

protection to beneficiaries. They should be sold at once, if that were true. The necessity for protection arises when testator dies and is quite as imperative at the moment the fiduciary receives the stock as it is later when he may wish to buy some. It is as necessary to preserve the estate at one time as the other, and to consider the safety of principal and the yield of a commensurate income. It is as important that the fiduciary should not speculate or take over testator's business of making money. The continued holding of a stock is as open to criticism on these counts as a new purchase. The rule of retention has grown up in relief of fiduciaries, not in any logical division of the problem of protecting the estate.

We do not feel it is an answer to say that the legislature should resolve the question. The legislature has hitherto dealt only with legal investments, and it is important to repeat that every act of assembly on the subject is permissive and not mandatory. This seems to us a clear indication that the legislature recognizes the right of testators to dispose of their property as they please and substitutes its will only when they are silent. The Supreme Court has said in Detre's Estate, supra, that where discretion is given in the will the act of assembly does not apply. The guardian ad litem rests his argument upon general equitable principles, not upon the premise that because the legislature has spoken when discretion is not given a prohibition against stocks must still be implied when it is given. Under the rule of Detre's Estate, supra, and kindred cases, we feel it is for the courts to decide what equitable principles, if any, are inherent in the exercise of discretion.

The tendency we are reflecting in this opinion is the tendency of the country. Only a few States have the conservative rule. Indiana, in Tucker et al. v. State ex rel., 72 Ind. 242 (1880), has held that a trustee with discretion may not invest even in an admittedly sound stock. Wisconsin has done the same in Pabst et al. v. Goodrich et al., 133 Wis. 43, 113 N. W. 398 (1907) ; and so has Missouri in regard to bonds of a newly-formed bridge

company without collateral: Cornet et al. v. Cornet et al., 269 Mo. 298, 190 S. W. 333 (1916). A case in the Federal courts, United States National Bank & Trust Co., etc., v. Sullivan et al., 69 F.(2d) 412, struck down an investment in stock when the trustee had the widest of discretionary powers, but the case arose in Wisconsin and the opinion says that the trustee was not warranted "in conducting the trust in a manner different from that authorized by the laws of Wisconsin."

In England the old rule has been referred to above. This has now changed, and the present rule is that discretionary powers in a will enable a trustee to invest in stocks. In In re Rayner, supra, the permissive wording was:

". . . and I declare that all moneys liable to be invested under this my will may be invested in such securities as my trustees in their absolute discretion shall think fit".

The trustees proposed to buy railway stock, and, it having been held that "securities" meant "investments", the purchase was upheld on summons proceedings. To the English court discretion meant discretion, and not something less.

In most of the States of the Union the strict rule contended for by the guardian ad litem does not apply. One of the leading cases on the subject is King v. Talbot, Elec. et al., 40 N. Y. 76, 83, decided in 1869, in which the court said of the old English rule:

"As a purely arbitrary rule, resting upon any special policy of that country, or on any peculiarity in its condition, it has no application in this country. It is not of the common law. It had no applicability to the condition of this country, while a colony of Great Britain, and cannot be said to have been incorporated in our law."

In In re Mersereau et al., 135 Misc. 387 (1929), the trustees were authorized to invest in such securities ". . . as they may select as being reasonably safe". The court there said:

"The trustee's discretion should be guided in the matter of reinvestments of securities with reference to the type of investment found in the decedent's estate at the time he died. I mean by this—securities that are seasoned and have behind them an established dividend record over a period of years. The trustees will be charged in administration with the usual rule of vigilance, that is, such diligence and prudence in the care of the estate as in general prudent men of discretion employ in their own like affairs. (*Matter of Leonard*, 118 Misc. 598; *Matter of Maloney*, 120 id. 456; *Matter of Wilmerding*, 135 id. 674)."

In Massachusetts the rule is very liberal, and the leading case is that of Harvard College, etc., v. Amory, 9 Pick. (Mass.) 446. The purchase of stock was expressly authorized by will. The court compared the security of stocks favorably to that of legal investments and laid down the simple rule that, apart from authority given in the will, the duty of a trustee is to conduct himself faithfully and exercise a sound discretion. This rule is followed in Massachusetts even where the will is silent as to the character of trust investments; and it applies to stocks: See Brown v. French, 125 Mass. 410; Thayer et al. v. Dewey et al., 185 Mass. 68.

In Delaware, the case of Wilmington Trust Co., etc., v. Worth et al., 19 Del. Ch. 314, is interesting because the chancellor decided that under Pennsylvania law trustees were not bound to invest in legals when given discretion, and held that the instrument freed them from the restriction.

The most recent case of importance on this subject is In re Leland Stanford University, decided by the Superior Court of San Jose County, California, on February 25, 1936, and as yet unreported. In III CCH Trust & Estate Service, par. 29734, page 18740, the following synopsis of the case appears:

"It may be conceded that in normal times a bond or secured obligation has a greater quality of security than

stock or debentures and is less subject to fluctuations in value. But it is likewise true that there are conditions under which even public securities suffer depression in value. Experience has also shown that investments in shares of private corporations may and often do afford a greater measure of safety and a greater income yield, than investment in public securities and bonds. . . . The court is of the opinion that the trustees may lawfully and properly make investment in bonds, debentures and shares of stock of well-managed private corporations which have enjoyed a reputation for stability and which command confidence".

. Other States which have followed the liberal rule in regard to stock investments are Rhode Island, Vermont, New Hampshire, Connecticut, Mississippi, West Virginia, Michigan, Kentucky, North Carolina, Wyoming, Ohio, Maryland, and Iowa.

The A. L. I. Restatement of Trusts also provides the liberal rule. Section 227 reads in part as follows:

"In making investments of trust funds the trustee is under a duty to the beneficiary

"(a) in the absence of provisions in the terms of the trust or of a statute otherwise providing, to make such investments and only such investments as a prudent man would make of his own property having primarily in view the preservation of the estate and the amount and regularity of the income to be derived."

Comment (*l*) upon this section says:

". . . The purchase of shares of preferred or common stock of a company with regular earnings and paying regular dividends which may reasonably be expected to continue is a proper trust investment if prudent men in the community are accustomed to invest in such shares when making an investment of their savings with a view to their safety."

Comment (*o*) reads as follows:

"o. Statutes confining trustees to certain types of investments are not construed as preventing the settlor

from empowering the trustee to make investments not designated by the statute."

We therefore hold:

1. The trustees of the Carwithen will are relieved of the restrictions of the Legal Investment Act.

2. Dealing in common and preferred stocks of corporations is included within the exercise of discretion given in the will.

3. The word "investment", as used in the will, includes such stock.

4. There is no principle or rule of law, independent of the will, which prevents their dealing in such stocks.

5. The exercise of their discretion is subject to strict review by this court and will be measured by the established standards of common care, common caution, and common prudence.

## Dissenting opinions

STEARNE, J., dissenting.—I dissent from the legal principle enunciated by the majority, viz, a fiduciary may invest trust res in preferred and common stock of private corporations where the trust instrument waives the restrictions imposed by legislative enactment concerning "legal investments".

The petitions for declaratory judgments, with two selected cases (Carwithen's Estate, no. 3089, October term, 1928; Donovan's Estate, no. 239, July term, 1911) as vehicles, is an effort by certain corporate fiduciaries to secure judicial determination upon this subject.

Under present economic conditions certain corporate stocks frequently possess better intrinsic worth and brighter future prospect than do some bonds and mortgages of high grade. Fiduciaries are being importuned to enter the field of preferred and common stock investments—by life tenants who desire higher income yield, and by apprehensive remaindermen who fear the present security of a fixed obligation.

We freely concede that a fiduciary's investment in cor-

porate stock is justified where the creator of the trust expressly authorizes it. Also, even in the absence of explicit language of authorization, where unequivocal words are used which clearly indicate an intent that the fiduciary may so invest. Such situations are matters for judicial constructions, and each will must be interpreted in its own language. In the absence of express words or of necessary implication, the problem presented concerns the legal effect of an *unqualified* exemption granted a fiduciary from adhering to the statutory "legal investments". This distinction, while narrow, is of extreme importance. The great bulk of cases arise where general words are used such as "without limiting my trustee to legal investments", etc. If such general words are *judicially* held to authorize investments in corporate stock, a new fiduciary investment field will be opened in this Commonwealth, involving countless millions of dollars, the ill or benign effect of which is the subject of considerable speculation and sharp difference of opinion.

No case has been cited in Pennsylvania which is directly in point, nor have we been able to find one. The majority opinion is a learned treatise and compendium of the law and history of trust investments and unquestionably constitutes a valuable contribution upon this subject matter. We regret, however, to be unwilling to concur in its basic conclusion.

The fundamental difference in opinion between the majority and minority lies in the opposed conception of the *basic nature* of a trust investment. It is the difference between a *loan* at interest and *ownership* with profits. The majority view testator's exemption from adhering to legal investments as an authority not only to make *loans* but to become *co-owners* by acquiring stock in corporations. The minority, upon the contrary, hold that such exemption never permits the trustee to use trust res to become a *co-owner* in a business enterprise.

Apparently the majority reach their conclusion in somewhat the following manner: Trustees are under the

cloak of protection if, exercising due care, they adhere to what the legislature has defined as trust investments. But where the creator of the trust removes the barrier, then the fiduciary has an open unrestricted field, subject only to the duty of due care. Evidently the protection of due care is held to extend merely to *corporate stocks* and no further. Apparently, in their opinion, if a trustee invests in other forms of ownership it will not be regarded as an exercise of due care, and therefore the investment would be improper. The minority, upon the contrary, are firmly of opinion that the manifest spirit of the courts and legislature, reflected in all of the decisions and acts, is that the trustee in investing trust funds must at all times maintain the rôle of *lender* rather than *buyer*. The Supreme Court very early ruled that the true test as to investment by the trustee is (1) security of principal and (2) an *immediate* income from the investment: Pray's Appeals, 34 Pa. 100, 110. It should also be remembered that a prudent man in his own estate, with the object of making money, may take greater risks than a trustee: Hart's Estate (No. 1), 203 Pa. 480, 485. Where a trust is erected it has been repeatedly ruled that the *life tenant* is the primary object of testator's concern, with the remaindermen protected so far as the security of the investment is concerned. All the apportionment cases, from Nirdlinger's Estate, 290 Pa. 457, down to date, reflect this thought. Thus, when a trustee invests trust funds he must keep constantly in mind that the life tenant is entitled to *immediate* income insofar as it lies within the power of the trustee. Such thought is reflected in the A. L. I. Restatement of Trusts, sec. 227 (*a*), wherein it is stated that the trustee is limited to:

". . . such investments as a prudent man would make of his own property having primarily in view the preservation of the estate and *the amount and regularity of the income to be derived*". (Italics ours.)

The weakness in the majority's view, in our opinion, is the placing of a sort of financial halo about a share of

corporate stock, which apparently becomes more brilliant if the stock sells high on the stock exchange and the statement of assets and liabilities, and the record of dividend payments, read well. They overlook that, in the last analysis, a share of stock in a private corporation is nothing more or less than a certificate of ownership. A corporation is in essence a partnership, or an association of owners, with liability limited by statutory enactment. With a share of stock no dividends may be obtained until a *majority* of the elected board of directors so decree. The principal may be secure enough today, but there is no insurance concerning tomorrow as to obligations incurred by the board of directors affecting value. There is no guaranty that there will *ever* be a dividend. A fixed obligation, on the other hand, presupposes an immediate fixed return, which may be promptly enforced.

The minority recalls the financial history of trust investments in this Commonwealth, narrated in the majority opinion. We remember the reasons reflected in the constitutional debates for the insertion of the article in the Constitution as to trust investments, and the protection still maintained concerning trust funds by subsequent constitutional amendment, and the Fiduciaries Act of June 7, 1917, P. L. 447, and the Act of 1935. The enactments were aimed for the protection of trust funds from the vicissitudes of trade, business and speculation, by limiting such investments to *loans*. Under such constitutional and statutory provisions such loans must be of the highest character. Until the Act of July 2, 1935, P. L. 545, such loans were legal investments only if secured upon the real estate or obligations of the Government, the State or its agencies. It is to be observed that the Act of 1935 still strictly adheres to *loans* but extends legal investments to a strictly high grade of *bond*, and about which is thrown the greatest of protection. Nowhere does the word *stock* of private corporations appear. To illustrate how restricted a stock investment was regarded, see the Act of June 13, 1836, P. L. 589, which

requires the committee in lunacy *to secure permission of the court* should he desire to invest in corporate stock: Davidson's Estate, 324 Pa. 90. To show how strictly the court requires adherence to law, a fiduciary is surcharged if he permanently invests the funds *in a savings account* of a bank and a loss ensues: Hazelbaker's Estate, 113 Pa. Superior Ct. 32; Byrnes' Estate, Supreme Court opinion of January 11, 1937 (not yet reported).

I am not disturbed concerning the rulings of the courts in England and other States in this country. Massachusetts has never had any statute or rule as to "legal investments". It regards solely the necessity for the exercise of common prudence. New York operates under a statutory code. In England, and most other States, modern decisions upon this subject are the result of legislative enactment.

Nor am I swayed by the apparent emergency or existing demand. In the important deficiency judgment case our Supreme Court did not hesitate to strike down the act irrespective of the alleged emergency, or how beneficially the act may have appeared to operate: Beaver County B. & L. Assn. v. Winowich et ux., 323 Pa. 483.

The minority hold that the acts and decisions clearly indicate that the basic idea of a trust investment is an assured immediate income to the life tenant, with due regard as to the security of the principal. I protest against this court sanctioning trustees embarking upon the financial seas of *ownership*, whether it be in common or preferred capital stock or in some other form of property or equities. If such a situation is deemed wise and desirable, then the responsibility rests with the legislature and not with the courts.

SINKLER, J., dissenting.—With the conclusions of the majority of the court I do not agree, and concur in the dissenting opinion of Stearne, J., agreeing also with the grounds upon which his opinion rests. I find an additional reason for dissenting from the opinion of the majority. My views on the subject of the investment of trust funds

in shares of common stock are set forth in my dissenting opinion filed in Donovan's Estate, 28 D. & C. 93, 106. The principle to guide us in both cases is elaborated therein, to wit, that the power to invest in other than legal investments for trust funds must be by express authority or by language that is clear and unambiguous. I am doubtful whether so brief an expression of authority as is contained in the will before us should be construed as authorizing the investment in shares of common stock. The language is as follows:

"3. To invest and reinvest, alter, vary and change investments and reinvestments from time to time, at discretion, without confining my Trustees to what are known as Legal Investments."

But even if it were so construed, the extent to which other than legal investments may be purchased is limited by the fifth and sixth paragraphs of the will, which are as follows:

"5. To purchase investments at a premium and to charge the premium over to principal or income, or partly to principal and partly to income, as they shall deem best.

"6. To exercise any option to subscribe for new stocks or bonds or certificates, or other instruments in the nature thereof, which may be given to them as the holders of any stocks or bonds or certificates, or other instruments in the nature thereof, belonging to my estate."

The extent of authority to invest in other than legal investments would then be limited under paragraph 5 to the purchase of investments at a premium, which must mean bonds or other obligations, and not shares of stock, or under paragraph 6 to increase the investments owned by the estate in shares of stock, bonds, or certificates through subscription for additional shares of stock, bonds, or certificates when the increase in the capitalization of the company was effected. If this construction is not a forced and untenable one, then testator has not by clear and unequivocal language given unlimited power of investment to his trustees. In my opinion this is not a forced and untenable construction.