# Pray's Appeals.

A trustee empowered to invest the trust-moneys " in any property, real or personal, that he may see fit," must invest the same in such manner as not only to secure the principal, but to obtain an immediate income from the investment.

Such a trustee is not justified in making an investment in the stock of a manufacturing company, the works of which are unfinished, and the stock not paid up in cash.

Barton's Estate, 1 *Pars.* 24, doubted, if not overruled.

A trustee is not justified in making such an investment, either by the previous request, or subsequent assent of his *cestui que trust,* who was a married woman, without knowledge of the situation and affairs of the company, and who had no power to control or interfere with the investment of the fund or the management of the estate.

APPEALS from the Orphans' Court of *Philadelphia.**

These were two appeals by Michael Pray, from the decrees of the court below, upon his accounts as trustee under the will of John Pray, deceased, for Mary Ann Spicer and Ann M. Hallett.

John Pray, by his last will, dated the 23d of June 1843, whereof he appointed the appellant the sole executor, devised as follows :—

" 2. I authorize and· empower my said executor, to lease and let, mortgage, sell, exchange, or otherwise dispose of, at his discretion, at such time or times, and in such manner, as he may deem necessary, any or all of my real and personal estate, which I now possess, may hereafter acquire, or be in any manner entitled to (except so much thereof as is hereinafter specifically disposed of), and to make and execute all necessary conveyances and assurances for the same, without any obligation of the purchasers or mortgagees to look to the application of the purchase-money or loans, or other consideration ; and to apply the proceeds arising therefrom, or so much thereof as shall be necessary, to the discharges of all lawful demands against my estate as aforesaid ; and to invest and re-invest in any other property, real or personal, that he may see fit, any surplus which may remain, or so much

* This case was argued at Philadelphia, and decided at Pittsburgh on the 19th October 1859.

thereof as may be necessary to carry into effect the trust hereinafter created, or any other provision or requirement of this my will; and the said investments and re-investments, or any part thereof, again to sell, change, alter, and dispose of, and again to re-invest the proceeds—and this to do as often, at such times, in such manner, and on such conditions, as he may think proper and deem most advantageous : It being my will and intention to vest in my said executor all the power and authority necessary for the management and settlement of my estate, in such manner as he in his discretion shall find requisite and see fit to exercise, as fully and effectually as I myself could lawfully have and exercise, if living, or that either of the parties in whose behalf the trust hereinafter mentioned is created, or to whom bequests are directly made, could lawfully have and exercise, if of full age, and unmarried, and the estate had been vested directly in them or either of them.

" 3. The residue and remainder of all my estate, real, personal, and mixed, after the payment of all lawful demands against the same as aforesaid, and taking therefrom the several items specifically appropriated (as hereinbefore excepted and hereinafter provided),I dispose of to my eight children now living, viz. : Charles, Michael, Samuel, Catherine, wife of George G. Lower, Ann M., wife of James Hallett, Maria, wife of William Cuthbert, Edward and Mary Ann, wife of George F. Spicer, and to their issue born, or which may be born, and respectively recognised as such by them, in the following manner, viz. : To my son Michael I give, devise, and bequeath one full, equal, and undivided eighth part of all my real, personal, and mixed estate, and to his heirs and assigns for ever.   To my son Samuel, I give, devise, and bequeath one full, equal, and undivided eighth part of all my real, personal, and mixed estate, and to his heirs and assigns for ever.

" 4. And whereas, my daughter Catharine is married to George G. Lower, and my daughter Ann M. to James Hallett, and my daughter Maria to William Cuthbert, and my daughter Mary Ann to George F. Spicer, and it is my will and intention that all the shares of my estate, real, personal, and mixed, now about to be devised by me, shall be enjoyed by them to their own use, free from the control and without let or molestation from their present husbands, or of any future husband, that either of my said daughters may have and take, and without being made liable for any debt or debts which they, or either of them, may have contracted, or may hereafter contract.   And whereas, my son Charles has been unfortunate in business, and my son Edward is deaf and dumb, and it being also my will and intention that their shares of my estate, real, personal, and mixed, now about to be devised by me, shall be enjoyed by them to their own use, and without being made liable for any debt or debts already contracted by

them, or either of them, or which they, or either of them, may hereafter contract, and without being liable to be disposed of by way of sale, assignment, or otherwise, by them or either of them : Now, I hereby give and bequeath all and singular the remaining six-eighths part of all my estate, real, personal, and mixed, to my son Michael, to have and to hold the same, to him, his heirs, executors, administrators, and assigns, to and for his proper use and behoof for ever, upon this special trust and confidence nevertheless, viz. : to have and exercise all the power and control over the same for the purpose of this trust as are given and specified in the second item of this my will for the management and settlement of my estate, and also for the avoidance of either or all of the said trusts, either in whole or in part as hereinafter specially provided for ; and to pay over, at such times as the same may safely and reasonably be ascertained, all the rents, issues, and profits thereof which shall accrue, and which may remain after the payment of the taxes, repairs, and all other necessary and proper charges and expenses, unto my said daughters Catharine, Ann M., Maria, and Mary Ann, and my sons Charles and Edward, in equal proportions of one-sixth part each ; and the receipts in writing of my said daughters, whether they be married or sole, shall be a sufficient warrant in the premises to all concerned : provided nevertheless, that that portion of the residue of my estate hereby granted and vested in trust to the use of my son Charles, shall be subject to and liable for the indebtedness of my said son Charles to me, and the amount of said indebtedness shall be first deducted from and taken out of the portion herein granted and devised to his use as aforesaid, before any other disposition shall be made thereof : and in case of the death of either of my said daughters Catharine, Ann M., Maria, and Mary Ann, or of either of my said sons Charles and Edward leaving issue, the trusts created in their behalf respectively as hereinbefore mentioned (still remaining in whole or in part unavoided as hereinafter provided for) the trustee shall be seised in the premises to the use of such issue, and in the same proportions, if more than one child, as such issue would have taken under the intestate laws of Pennsylvania, had either of my said daughters died, being of full age, a widow, or had either of my said sons, Charles or Edward, died, leaving such issue, and the property had been vested in him, her, or them.

"And whereas, the great, principal, and only object I have in view in creating the trusts aforesaid, is to secure to my said children and their issue, the greatest benefits from their shares of my estate : And whereas, a contingency might hereafter arise in which the personal exertions of my said children, if well directed and aided by the means, which an absolute possession of their respective interest in my estate would afford, might best accomplish my desire for their future welfare, and therefore having in

view the possibility of such a state of things arising at a future day, which to carry into effect my desire as aforesaid, might render necessary the avoidance of some one or all of the trusts aforesaid, either in whole or in part: And whereas, I have full confidence in the sound discretion of my said son Michael, trustee as aforesaid, to judge of such contingency and to determine upon the propriety and expediency of either avoiding such trust or continuing the same, whether in whole or in part; now therefore, it is my will, that upon application in writing to the said trustee by either of my said six children, viz.: Charles, Catharine, Ann M., Maria, Edward, and Mary Ann, desiring that the portion of my estate, real, personal, and mixed, or any part thereof, devised by me in trust to the use of such child, should be paid over and vested in such applicant absolutely, the said trustee is hereby fully authorized and empowered to grant or withhold his assent thereto at his discretion, and to avoid or continue the trust aforesaid, so far as respects such applicant, either in whole or in part as aforesaid, as fully and effectually as I myself might or could do, if living, any provision to the contrary hereinbefore contained notwithstanding. And upon the said trustee consenting and determining to thus avoid any or either of the aforegoing trusts, either in whole or in part as aforesaid, he is fully authorized and empowered to do so, and is hereby directed to pay, assign, transfer, and set over to such child, either the whole or such part of the share of my estate, real, personal, and mixed, hereinbefore devised in trust to the use of such child, as he in his discretion shall deem proper and expedient; which estate or so much and such parts thereof as shall be so paid, assigned, transferred, and set over, shall thereupon vest in such child absolutely for ever, as fully and effectually free and discharged from all the conditions of such trust, as if the said trust had not been created, and such portion of my estate had been originally vested in such child; and the receipt or other sufficient acknowledgment of either of my said daughters, whether they be married or sole, shall be a full and absolute discharge of the said trustee in the premises.

" 5. It is further my will that, if either of my said children in whose behalf the aforegoing trust is created, viz.: Charles, Catharine, Ann M., Maria, Edward, and Mary Ann, should die without leaving issue surviving, the trust created in behalf of such child still remaining unavoided, either in whole or in part, as hereinbefore provided for the avoidance thereof, that the portion of my estate, real, personal, and mixed, bequeathed to such child so dying, so far as the same shall not have been previously reduced to actual possession, shall revert back, and from part of the residue of my estate, and shall be taken and enjoyed by the survivors or survivor, and the issue of such as shall have died leaving such issue, in equal proportions; such issue only taking such share as

the parent would have taken if living, and subject to the same trusts, conditions, uses, and purposes, and in the same manner as is hereinbefore or hereinafter provided; and provided always, that in the event of any such share or shares as aforesaid, reverting in manner as aforesaid, the enjoyment of the same shall be confined solely and exclusively to the survivors or survivor among my eight children hereinbefore named, and the issue of such of my said eight children as shall have died leaving such issue."

In 1855, on the petitions of Mary Ann Spicer and Ann M. Hallett, the appellant was cited to file his accounts, which were subsequently referred to an auditor, before whom the principal question was, the right of the trustee to be allowed for an investment of $3000 for each trust, in the stock of The Pennsylvania Oil Company.

In reference to these investments the auditor reported as follows:—

"The Pennsylvania Oil Company was incorporated under an Act of Assembly, passed the first day of May 1852, entitled 'An Act to incorporate the village of Venango, in the county of Crawford, into a borough,' &c. By this act the provisions of the act entitled 'An Act to encourage manufacturing operations in this Commonwealth,' approved the seventh day of April 1849, were extended to companies which might be formed under the said act, for the manufacture and vending of oil and other products of rosin. The object of the company was to manufacture rosin oil from a certain patent called Robbins' patent, bearing date the fourth day of November 1851. The chief operations of the company were to be carried on at Chester, in the county of Delaware, and the state of Pennsylvania. At the time of the said investments, the works of the company were unfinished, nor were they completed until November or December 1853.

"The capital stock was divided into 200 shares of $100 each. It was all subscribed by four persons, in connection with those interested in the patent. There was no evidence that any part of the capital stock was paid in cash. The company purchased eleven and a half or twelve acres of land, at $300 per acre, upon which they erected buildings and improvements, which cost, with the land, $69,000. The lands and improvements were encumbered by judgments and mortgages to the amount of $44,291, to which is to be added an assessment of twenty-five per cent. on the stock, amounting to $30,000 or $35,000, called a preferred loan, which together amounted to a sum exceeding the cost of the land and the improvements. The company commenced operations in November or December 1853, and ceased them about the first day of October 1854, being unable to pay their debts. In March 1855, they leased the works to R. Wilson Desilver, for the term of five years. In lieu of rent, Mr. Desilver agreed to pay the

[Pray's Appeals.]

interest on the mortgage of $25,000, and the interest on $3491 (which was the balance due on another mortgage for $10,000), the taxes amounting to about $200 per annum—keep the premises insured to the amount of $10,000, for which he paid the annual premium of $150, and keep the premises in repair. This arrangement obviously was not made with a view to dividends on the capital stock, and no dividend in fact was ever made, nor was there any satisfactory evidence given tending to show that there ever will be.

"On the other hand, the trustee gave evidence to prove that a considerable number of men of business, reputed, and no doubt justly, as intelligent and prudent in the management of their affairs, in the years 1852 and 1853, bought of this stock at par, most of whom paid for it in cash, but some in merchandise or real estate. He proved that one individual actually paid a premium or bonus of $100 to procure 60 shares of it at par—that the stock was regarded by those who purchased of it as a safe investment at the time—that large profits were expected from it, although none were ever realized. Most of the witnesses who testified to this effect were purchasers of the stock, and holders of it at the time they gave their testimony; but it did not appear whether the stock had or has at present any market value whatever."

By an instrument in writing, called a covenant of release, exoneration, and discharge, dated the 23d day of May 1853, executed by Mrs. Spicer under her hand and seal, she declared, among other things, that the investment made on her account by the respondent, her trustee, of $3000 in the purchase of forty shares of the capital stock of the Pennsylvania Oil Company (said investment having been so made on the 8th day of February 1853), was made at her special instance and request, and by and with her full and entire approbation and consent; and by the same instrument, she undertook to release and exonerate her trustee, and (assuming she had the power to do so) did actually release and exonerate him of and from any and all liability for interest upon the said sum of $3000, after the date of its investment in the said stock, other than that which should or might accrue from dividends, if any should be declared, upon the said stock, and be derived therefrom.

It appeared also that Mr. Spicer, the husband of Mrs. Spicer, called on the secretary of the Pennsylvania Oil Company previously to the investment, relative to the stock, and from inquiries made and answered, he was perfectly satisfied as to the prospects of the company. It appeared also that Mrs. Spicer herself called at the office of the company, with her sister, Mrs. Hallett, and conversed with the secretary with reference to the property of the company.

The following instrument executed by Ann M. Hallett, was also proved before the auditor :—

"Whereas Michael Pray, trustee (under the will of John Pray, late of the county of Philadelphia deceased) of the undersigned Ann M. Hallett, one of the children and devisees of the said deceased—did, on the 8th day of February, A. D. 1853, at her especial instance and request, and by and with her full and entire approbation and consent, first had and obtained, out of her portion or share of the residue of the estate of said deceased, held by him as her trustee as aforesaid, invest for her the sum of three thousand dollars, part of her said portion or share, in the purchase of forty shares of the capital stock of the Pennsylvania Oil Company,"as per certificate No. 170, held by said trustee for her use and benefit : and whereas by the account filed in the office of the Register of Wills in and for the city of and county of Philadelphia, on the 7th day of April, A. D. 1852, by the said Michael as executor of said deceased, and by and with the approbation and consent of the said Ann M. Hallett, the residue of said estate for distribution among the heirs and devisees was ascertained and apportioned to each respectively, in the manner therein stated, which by reference thereto, will fully and at large appear : and whereas the portion or share of the undersigned, as ascertained and apportioned as aforesaid, amounted in all to the principal sum of six thousand nine hundred and fifty-seven dollars and thirty cents ($6957.30), which said sum was made up of two smaller sums, bearing interest from different dates as follows, viz. : The sums of six thousand four hundred and twelve dollars and eighty-two cents, bearing interest from October 27th 1849, and the sum of five hundred and forty-four dollars and forty-eight cents, bearing interest from January 1st 1851; the said two several sums making together the aforesaid sum of $6957.30 : and whereas it is the wish of the undersigned, that the balance remaining of her said share, viz. : the sum of three thousand nine hundred and fifty-seven dollars and thirty cents (being the surplus of her said share, remaining over and above the investment made in the purchase of the said stock), shall be retained by her said trustee out of that part of her said share which bears interest from the 27th October, as aforesaid : Now therefore know all men by these presents, that I, Ann M. Hallett, do hereby declare that the investment made on my account by my said trustee of three thousand dollars, in the purchase of the forty shares of the stock of the Pennsylvania Oil Company, as hereinbefore recited, was so made, at my special instance and request, and by and with my full and entire approbation and consent : And I do hereby further request, consent, and agree, that the said three thousand dollars invested for me in the stock as aforesaid, shall be held and considered as having been taken out of the said two several principal sums, as hereinbefore

set forth, in the manner and in the portions as follows, viz.: that is to say—The whole of the said sum which was as aforesaid, apportioned and assigned to bear interest from January the 1st 1851, viz., the sum of five hundred and forty-four dollars and forty-eight cents, shall be held and considered as having been so taken and applied; and of the sum so as aforesaid apportioned and assigned to bear interest from October 27th 1849, there shall be held and considered as having been taken, and so applied, the sum of two thousand four hundred and fifty-five dollars and fifty-two cents, said two sums making together the amount or sum of three thousand dollars invested in stock as aforesaid. I do further hereby exonerate and release the said trustee of and from any and all liability for interest upon the said sum of three thousand dollars invested for me in stock as aforesaid, other than that which shall or may accrue from dividends, if any may be declared upon said stock and derived therefrom. In witness whereof, I, the said Ann M. Hallett, have hereunto set my hand and seal this twenty-first day of May, A. D. 1853."

The auditor disallowed the credits claimed for these investments, and struck the same out of the accounts; and the court below having confirmed the reports of the auditor, and decreed accordingly, these appeals were taken by the trustee.

*G. Junkin, Jr.*, and *F. C. Brewster*, for the appellant, cited *Story's Eq.* § 1272; Knight *v.* Plymouth, 3 *Atk.* 480; Thompson *v.* Brown, 4 *Johns. Ch.* 619; Osgood *v.* Franklin, 2 *Id.* 27–8; *Hill on Trustees* 495; Johnson's Appeal, 12 *S. & R.* 325; Konigmacher's Appeal, 1 *Penn. R.* 207; Dillebaugh's Estate, 4 *Watts* 177; Nyce's Estate, 5 *W. & S.* 254; Twaddell's Appeal, 5 *Barr* 17; Rush's Estate, 2 *Jones* 375; Barton's Estate, 2 *Pars.* 28; Chew *v.* Chew, 4 *Casey* 17; 1 *Sugden on Powers* 341; 2 *Id.* 511; Stanley's Appeal, 8 *Barr* 432; Morris *v.* Wallace, 3 *Id.* 319; McCahan's Appeal, 7 *Id.* 56; Hemphill's Appeal, 6 *Harris* 305; Worrell's Appeal, 11 *Id.* 44; Angue's Estate, 14 *Leg. Int.* 300.

*Clay*, for A. M. Hallett, and *Parsons*, for M. A. Spicer, cited Hemphill's Appeal, 6 *Harris* 303; Worrell's Appeal, 11 *Id.* 44; Angue's Estate, 14 *Leg. Int.* 300; Langston *v.* Ollivant, *Cooper* 33; Booth *v.* Booth, 1 *Beaver* 125; Trafford *v.* Boehm, 3 *Atk.* 444; Rider *v.* Bickerton, 3 *Swan* 80, note; Wilkes *v.* Steward, *Cooper* 6; De Manneville *v.* Crompton, 1 *V. & B.* 359; *Hill on Trustees* 369, 370; Westover *v.* Chapman, 1 *Coll.* 177; Hockley *v.* Bantock, 1 *Russell* 141; Watts *v.* Girdlestone, 6 *Beaver* 188; Commonwealth *v.* McAlister, 4 *Casey* 480; 6 *Id.* 536; Chew *v.* Chew, 4 *Id.* 17; Pocock *v.* Reddington, 5 *Ves.* 794; Milsington *v.* Earl Mulgrave, 3 *Mad.* 491; *Hill on Trustees* 724–5; Roseburgh *v.*

Sterling, 3 *Casey* 292; Miltenberger *v.* Croyle, *Id.* 170; Stoops *v.* Blackford, *Id.* 213; Lancaster *v.* Dolan, 1 *Rawle* 231.

The opinion of the court was delivered by

READ, J.—By his will the testator authorized and empowered his executor, who was his eldest son, to sell all his real and personal estate, and to apply the proceeds, or so much thereof as shall be necessary to the discharge of all lawful demands, against his estate, and to invest and re-invest in any other property real or personal, that he may see fit, any surplus which may remain, or so much thereof as may be necessary to carry into effect the trust thereinafter created, or any other provision or requirement of his will. The residue of his estate he disposed of to his eight children and to their issue, born and to be born; and as to six eighth parts of it he provided as follows:—

" 4. And whereas my daughter Catharine is married to George G. Lower, and my daughter Ann M. to James Hallett, and my daughter Maria to William Cuthbert, and my daughter Mary Ann to George F. Spicer, and it is my will and intention that all the shares of my estate real, personal, and mixed, now about to be devised by me, shall be enjoyed by them to their own use, free from the control, and without let or molestation from their present husbands, or any future husband that either of my said daughters may have and take, and without being made liable for any debt or debts which they, or either of them, may have contracted, or may hereafter contract. And whereas my son Charles has been unfortunate in business, and my son Edward is deaf and dumb, and it being also my will and intention that their shares of my estate real, personal, and mixed, now about to be devised by me, shall be enjoyed by them to their own use, and without being made liable for any debt or debts already contracted by them, or either of them, or which they, or either of them, may hereafter contract, and without being liable to be disposed of by way of sale, assignment, or otherwise, by them, or either of them. Now I hereby give and bequeath all and singular the remaining six-eighths part of all my estate, real, personal, and mixed, to my son Michael, to have and to hold the same to him, his heirs, executors, administrators and assigns, to and for his proper use and behoof for ever, upon this special trust and confidence, nevertheless, viz., to have and exercise all the power and control over the same *for the purpose of this trust*, as are given and specified in the second item of this my will for the management and settlement of my estate, and also for the avoidance of either or all of the said trusts, either in whole or in part, as hereinafter specially provided for, *and to pay over, at such times as the same may safely and reasonably be ascertained, all the rents, issues, and profits thereof which shall accrue,* and which may remain after the payment of the taxes, repairs,

and all other necessary and proper charges and expenses, unto my said daughters, Catharine, Ann M., Maria, and Mary Ann, and my sons, Charles and Edward, in equal proportions of one-sixth part each, and the receipts in writing of my said daughters, whether they be married or sole, shall be a sufficient warrant in the premises to all concerned." Then follows a provision for deducting from Charles's portion his indebtedness to the testator, and then the will proceeds: " and in case of the death of either of my said daughters, Catharine, Ann M., Maria, and Mary Ann, or either of my said sons, Charles and Edward, leaving issue, the trusts created in their behalf respectively, as hereinbefore mentioned, still remaining in whole or in part, unavoided as hereinafter provided for, the trustee shall be seised in the premises to the use of such issue, and in the same proportions, if more than one child, as such issue would have taken under the intestate laws of Pennsylvania, had either of my said daughters died, being of full age, a widow, or had either of my said sons, Charles or Edward, died leaving such issue, and the property had been vested in him, her, or them."

Then follows a provision for an avoidance, in whole or in part, of either of the said trusts by the trustee, upon the application in writing to him by either of the said *cestuis que trust.*

It is clear, therefore, that these shares were trust property belonging to his children for life, and after their death to their issue, and that the powers given to the trustee, however large, were to be exercised solely for the benefit and advantage of the *cestuis que trust.* The testator undoubtedly intended to provide for the regular support of his daughters and his insolvent and deaf and dumb sons, by securing the payment over to them during their lives of the net income of their shares.

It would seem, that the whole estate, which was principally real, was sold by the trustee, and it then became his express duty by the will to invest the shares of the *cestuis que trust* in some productive property, in order to fulfil the first intention of the testator, which was the maintenance of his married daughters and his helpless sons. The large powers vested in their brother, the trustee, were therefore to be exercised for this object, taking care, at the same time, that the capital, in which their issue had a deep interest, should neither be impaired nor placed at hazard. The general rule is well settled, that where trust-money cannot be applied either immediately, or by a short day, to the purposes of the trust, it is the duty of the trustee to make the fund productive to the *cestuis que trust* by the investment of it on some proper security. Our Act of Assembly has provided for just such a case, where the principal or capital is to remain for a time in his possession or under his control, and the interest, profits, or income thereof are to be paid away, by authorizing investments to be

made in certain public stocks, or on real securities, which, when made under an order of the Orphans' Court, exempt the trustee from all liability of loss for the same.

In this will no specific securities are mentioned, and therefore such investments as the court would authorize would not be contrary to any direction contained in it, and if this trustee had pursued the course pointed out by the act, he would have been saved harmless.

The Act of Assembly and the general rule contemplate two objects: 1. Security of the principal sum. 2. An immediate income from the investment.

If, therefore, the trustee has, by the terms of the will, a wider range of objects of investment, but none specifically authorized and pointed out by name, the discretionary power with which he is clothed, must be exercised prudently and carefully, and with a single eye to the interests of the *cestuis que trust*, which clearly demand a present income with a secured principal.

It is certain that, by the terms of the will, the trustee could not lend money on personal security, and of course he could not lend money to a manufacturer of rosin oil under Robbins' patent, to be used in his business; and it would hardly be asserted that the trustee could, by the purchase of a share, invest the trust funds in an ordinary partnership for the purpose of making rosin oil. The language of the will itself excludes any such idea, and this brings us to the question whether the mere act of incorporating such a partnership can make such a purchase or investment prudent, discreet, and legal?

In the first place, it is said, the trustee had previously invested his own money in this company. This proves nothing; for he might find that it required more capital, or he might wish to obtain the control of its affairs by additional stock being subscribed for persons whose money he held, and which would be represented by him. The argument on this part of the case is against the good faith of the trustee, particularly if it be true that he became the president of the company.

In the next place, what was the nature of this business? Was it a tried one? Was it in full operation, and declaring dividends? Was the original capital paid up? or was there even any original capital in it? These questions can be best answered by statements taken from the master's report.

Long after the death of the testator, the legislature, on the 7th April 1849, passed "An act to encourage manufacturing operations in this Commonwealth," upon complying with the provisions of which, five or more persons could form themselves into a corporation, for the purpose of carrying on certain manufactures therein specified.

Persons holding stock in any such company as trustees, are not

[Pray's Appeals.]

personally liable as stockholders, but the estates and funds in the hands of such trustees are liable in their hands in like manner, and to the same extent, as the testator or person interested in such trust-fund would have been if they had respectively been living and competent to act, and held the same stock in their own names: provided, that nothing therein contained shall be construed as authorizing investment by trustees in such stock. By other provisions, the capital stock of such company may be increased or diminished by a vote of the holders of two-thirds of all the shares, and every such trustee may represent the shares of stock in his hands at all meetings and elections of the company, and may vote accordingly as a stockholder.

This act was extended by an Act of the 1st May 1852, to companies which might be formed under it, for the manufacture and vending of oil and other products of rosin, and under it The Pennsylvania Oil Company was incorporated. The object of the company was to manufacture rosin oil from a certain patent called Robbins' patent, bearing date 4th November 1851. The chief operations of the company were to be carried on at Chester in the county of Delaware, where the works were situated, the office of the company being in Fourth street near Chestnut street, in the city of Philadelphia.

At the time of the two investments in the stock of this company, which are the subjects of controversy, which, by the accounts of the trustee, appears to be the 8th February 1853, the works were unfinished, nor were they completed until November or December in that year.

The capital stock of the company was divided into two thousand shares of one hundred dollars each. It was all subscribed by four persons, in connection with those interested in the patent, fulfilling nominally the requirement of five or more persons. The capital being $200,000, one-fourth of it, or $50,000, should have been paid down before the company could become a corporation, and fifty per cent., or $100,000, must be paid before it could commence operations. These sums must be actually paid in cash, and yet the master reports, "There was no evidence that any part of the capital was paid in cash." The whole capital was therefore a fiction, having no foundation in reality, and the certificate was a fraud upon the Commonwealth. The company purchased eleven and a half or twelve acres of land, at three hundred dollars per acre, upon which they erected buildings and improvements, which cost with the land sixty-nine thousand dollars. The lands and improvements were encumbered by judgments and mortgages to the amount of forty-four thousand two hundred and ninety-one dollars, to which is to be added an assessment of twenty-five per cent. on the stock, amounting to thirty or thirty-five thousand dollars, called a preferred loan, which, together, amounted to a

sum exceeding the cost of the land and the improvements. The company commenced operations in November or December 1853, and ceased them about the first day of October 1854, being unable to pay their debts. The subsequent history of this speculative failure is simply that of entire ruin.

It is clear that no original capital was put into this company by its projectors and original subscribers and stockholders, and that when the trustee bought for each of his sisters forty shares of full stock, he was paying their money for what represented nothing but a mere fiction.

It is clear, also, that the works were in an unfinished state, and with the land on which they were built were so encumbered by mortgages and judgments, that no trustee would have been justified in loaning trust-funds upon the security of their property. It is hardly necessary to say, that the purchase of stock in such a company, with trust-funds, by a trustee, thus making his *cestuis que trust* partners in an insolvent manufactory, is still more unjustifiable, and cannot be recognised as a legal and proper investment. It wants all the characteristics of a judicious investment, for, 1st, There was no security for the capital present or prospective: 2d, It produced no income, nor did it offer the slightest prospect of ever affording any: 3d, The whole was an untried and unfinished experiment.

If such investments are to be countenanced by courts of justice, then the money of infants, married women, deaf and dumb people, idiots and lunatics, will be placed at the mercy of speculative or dishonest trustees, instead of their discretionary action being regulated by sound and well-settled principles of jurisprudence. It is not necessary in this case to decide whether, where a discretion is left, the trustee should always adhere to the securities pointed out by the Act of Assembly; but we must say that we think it the safest and wisest course.

In our own books, we have no such gross violation of the rules governing investments by trustees, as the present; the nearest being that of the Estate of Esther Barton, 1 *Parsons' Eq. Cases* 24, decided by Judge KING in 1842. There, at the time of the investment, the stock and loans were valuable paying securities; and even this case is much shaken by the later decisions of Hemphill's Appeal, 6 *Harris* 303, and Worrell's Appeal, 11 *Harris* 44, if not substantially overruled.

It would require a positive legislative enactment, to oblige us to recognise as legal, an investment of trust-funds by a trustee in an unfinished manufactory for making oil from rosin by an untried patent, overloaded with debt, and really built with borrowed capital: and yet such is the case presented to us, of the two investments made by this trustee for the alleged benefit of his two married sisters and their issue.

[Pray's Appeals.]

The case of Kimball *v.* Reding, 11 *Foster's N. Hamp. Reports* 352, is full to the point, and its reasoning against an investment of a similar character is unanswerable. It is time that this mode of wasting the property of infants and married women should be put an end to. It will save both trustees and *cestuis que trust* hereafter, by declaring that no such investments can be sanctioned or sustained by this court.

It is, however, alleged that these married women wished these investments to be made, and subsequently ratified them. What did these females know of the actual state of this concern? Were they told of its origin, its embarrassments, and its original want of capital? Would they learn this at the office of this insolvent corporation, in the city, of its secretary? or were they informed of the real state of its affairs by their trustee, who had already embarked in this scheme of speculation? The last place to inquire at, for the real state of a failing corporation, is at its office, and of its directors and officers. The uniform practice is to withhold the truth, until it is disclosed to the public at large by the pressure of overwhelming necessity. It is certain that these poor and credulous females never heard the truth from the company or their trustee, and therefore their approval or ratification becomes entirely immaterial.

There is, however, strong proof on the face of the covenants of exoneration and release, produced by the trustee, to show that the whole was his act; and that it was coupled with an agreement which he had no right to ask, and they had no right to make, that the remaining part of their trust-funds should remain in his hands uninvested—a proceeding directly in the teeth of the will, and contrary to his duty as an honest fiduciary.

From the whole facts of the case, it is clear, that the trustee, from the period of the sale of the estate of the decedent, held these trust-moneys in his own hands uninvested, and that he took about one-half of these funds, which had been mixed with his own moneys, and purchased these shares in this manufactory, in which he was already a part owner. He had avoided the trusts in part for both sisters; and these transactions are mixed up with these investments, and with a further illegal agreement that the remaining parts of the trust-fund shall remain in his hands uninvested.

It is impossible not to see the effect of all this upon these *cestuis que trust.* They have a large sum in his hands without security—he gives them a part, and then they approve a bad investment—and agree, he shall violate the will of the testator, by retaining the balance, without placing it out, in some productive and secure fund.

As no power was reserved to these two married women in the will creating the trust, to control or interfere with the investment

of the funds, or the management of the estate, their previous request to make the investments, or assent to them afterwards, could not in any degree diminish, alter, or affect, the responsibility of the trustee.

Decree in each case affirmed.

STRONG, J., dissented.