## Summerton v. Mead

*Myer A. Kornreich,* for plaintiffs.

*Richard A. Leuthold,* for defendants.

FLICK, P. J., May 2, 1962.—A petition has been filed by R. N. Summerton, Lynn Branch and R. A. Niver, auditors for Warren County, under the Uniform Declaratory Judgment Act of June 18, 1923, P. L. 840, as amended and supplemented, 12 PS §831-53, asking the court to determine whether it is lawful for the Warren County Commissioners acting as Commissioners of the Rouse Estate to invest Rouse Estate funds in such securities as are legal investments for funds in the hands of fiduciaries.

In view of the Supreme Court's decision in Carwithen's Estate, 327 Pa. 490, there is some doubt as to whether the court should render a declaratory judg-

ment. However, in that case the trustees sought advice in advance concerning the legality of investing trust funds in corporate stock, whereas in the instant case the questioned investment has already been made. Also, the averment of the auditor's petition that there is a present or imminent controversy is not denied. Therefore, the court will exercise its discretion and render a declaratory judgment as requested.

Respondents named in the petition are Blain M. Mead, Lewis Crippen and Clarence Akeley, Commissioners of the Rouse Estate. The petition was filed March 16, 1962, endorsed with notice to plead, and service was accepted. On March 19, 1962, a stipulation between counsel for petitioners and counsel for respondents was filed providing that "all further notices, rules and argument are waived, and this case shall be at issue, with leave to file briefs on or before March 22, 1962.

It was explained to the court that the petitioners were finishing their work of auditing accounts of county officers for the year 1961, and the accounts of the Commissioners of the Rouse Estate and its appointed treasurer, and that they were anxious to secure a declaratory judgment on the question raised, before the first Monday of April. The stipulation was approved and the court agreed to study the matter at once and to endeavor to hand down an opinion and decree within the requested period, or as soon thereafter as possible.

Briefs of counsel were filed as stipulated. Neither brief cited a single case, which clearly shows the unusual nature of the issue involved. Both briefs recite the seven acts of Assembly, beginning with that passed almost exactly 100 years ago creating the corporation entitled "Commissioners of the Rouse Estate", which bear on the question raised, and also article IX, sec. 7, of the Constitution of Pennsylvania of 1874.

The petition is not answered and the averments are taken as true. The alleged facts are meager but they indicate the present or imminent controversy which forms the jurisdictional basis for the petition under the Uniform Declaratory Judgment Act, supra. While performing their duties as county auditors, petitioners found: "That during the year 1961 the respondents purchased 60 shares of Southern California-Edison common stock for the sum of $4,313.38 from the Rouse Road Permanent Fund and 10 shares of the same for the sum of $724.63 from the Rouse Poor Permanent Fund." The petition questions whether such investments are lawful in view of article IX, sec. 7 of the Constitution of 1874, which provides: "The General Assembly shall not authorize any county . . . to become a stockholder in any company, association or corporation . . ."

From the nature of the declaratory judgment sought by the auditor's petition, it is implied and will be assumed that the questioned investment in common stocks is lawful if the Fiduciaries Investment Act of May 26, 1949, P. L. 1828, as amended, 20 PS §821 et seq., governs the investment of assets in the hands of the Commissioners of the Rouse Estate, a body corporate created by the Act of April 5, 1862, P. L. 407. To determine whether such is the fact, preliminary and subsidiary questions must be answered. What is the purpose for which the legislature by the Act of 1862 declared the commissioners of Warren County, and their successors in office, to be "a body corporate, under the name, style and title of Commissioners of the Rouse Estate"? Are the purposes, duties and powers of this corporation so similar to or interwoven with those of Warren County that the constitutional restriction which forbids any law authorizing a county to become a stockholder in any company, association or

corporation, apply to the Commissioners of the Rouse Estate, as to investment of Rouse Estate funds?

To answer these questions requires an examination of facts which do not appear in the petition but do appear, for the most part, in the Warren County records, the records of the Commissioners of the Rouse Estate, and the Acts of Assembly referred to.

"Rouse", of course, is Henry R. Rouse, who died April 17, 1861, a resident of this county, having suffered fatal injuries in the explosion of one of the early oil wells in what is now known as Rouseville, Venango County. He was only 37 years of age at the time of his death, but he had accumulated quite a fortune, a saw mill, timber and oil lands, and other properties, worth about $200,000. In a dying condition he dictated a truly remarkable will. It was probated May 1, 1861, as appears in Warren County Register's Docket 3, pages 455-56. There are 20 specific bequests to various friends, relatives, business associates and employees, including "two gentleman who carried me out of the fire."

The first paragraph of Henry R. Rouse's will names his executors. The second paragraph reads: "I bequeath to my father, Samuel D. Rouse, $500.00 per year during his lifetime." The twenty-second paragraph bequeaths Henry's library to his father. As Henry never married, had no brothers or sisters, and his mother predeceased him, the father would have inherited the entire estate under the intestate laws if Henry had died without a will. This is important in view of the fact that the two paragraphs which dispose of the residue of the estate, in trust, were invalid and the residue was inherited by the father. It is not necessary here to mention the other specific bequests.

The paragraphs disposing of the residue are as follows:

"8. I bequeath the residue of my estate, after making some other bequests, to the Commissioners of Warren County, the interest of it to be expended on the roads of said County, after I make some other bequests.

"15. I wish to change the object of the bequest contained in number eight so as to give the benefit of one-half of it to the poor of Warren County. It is given in trust to the County Commissioners for that purpose."

After probate of the will, the county solicitor discovered that the use which Henry R. Rouse wished to make of the bulk of his estate, and the trust provided to carry out such intent, were void under section 11 of the Act of April 26, 1855, P. L. 328, which provides:

"Section 11. That no estate, real or personal, shall hereafter be bequeathed, devised, or conveyed to any body politic, or to any person in trust for religious or charitable uses, except the same be done by deed or will, attested by two credible, and, at the time, disinterested witnesses, at least one calendar month before the decease of the testator or alienor; and all dispositions of property contrary hereto, shall be void and go to the residuary legatee or devisee next of kin, or heirs, according to law. . . ."

From the foregoing it is apparent that there is something rather remarkable in the fact that the residue of the estate of Henry R. Rouse has been held and the income used for the poor and roads of Warren County in spite of the invalidity of his testamentary gift for that purpose. The residue passed by operation of law to Henry's father. He alone could transfer the property so that the intent expressed in the eighth and fifteenth paragraphs of the will could be carried out, and the trust created and the income used as it has been used for the poor and the roads of Warren County. This he was persuaded to do, by W. D. Brown, Esq., then county solicitor and later President Judge, and Myron

Waters, long a close friend of Henry Rouse and also acquainted with his father. By deed dated June 1, 1861, recorded in Warren County Deed Book S at page 404, in consideration of the sum of $8,000 advanced by Myron Waters from his own funds, Samuel D. Rouse sold and conveyed to Myron Waters "all the right, title, interest, claim and demand that the said Samuel D. Rouse may have of, in or to the estate of the said Henry R. Rouse, and hereby releasing and conveying to said Waters, his heirs and assigns, the legacy of $500.00 per year left the said Samuel D. Rouse by the will of said Henry R. Rouse."

The deed also provided that Myron Waters was to hold the property until he was paid the money advanced and reasonable expenses and compensation for looking after the estate, "and after the payment of the consideration money and interest as aforesaid, and the reasonable expenses and compensation aforesaid, then the said Waters, his heirs and assigns, to convey the said estate to the Commissioners of Warren County, Pennsylvania, for the uses and purposes designated in said will of Henry R. Rouse, and for the purpose of carrying out the provisions of the said will."

If these facts had transpired 100 years later, the next step would be obvious. Myron Waters would convey the residue of the Henry Rouse Estate to the Warren County Commissioners, in trust, for the uses and purposes set forth in the eighth and fifteenth paragraphs of the will, the funds to be kept invested and the income used for the roads and the poor of the county. Maintenance of roads and care of indigent county residents are now county obligations by the County Code, and the county commissioners are specifically authorized to accept gifts: See 16 PS §202(3). Under such conditions, it could hardly be argued that the Fiduciaries Investment Act would not govern investment of funds which came from the Rouse Estate. In 1861,

the county commissioners had nothing to do with either the support of the poor or the maintenance of roads. They had no right or authority to levy taxes or expend county monies for such purposes: the trust which Henry R. Rouse intended to establish by his will was something new. The deed from Henry's father to Myron Waters required him to convey all of the assets of the estate, after payment of legacies, "to the Commissioners of Warren County, Pennsylvania, for the uses and purposes designated in the said will of Henry R. Rouse, and for the purposes of carrying out the provision of the said will." However, this could not be done because the county commissioners, as constitutional county officers, had no right to accept the gift for the county or to carry out the provisions of the will.

The county solicitor and Henry's friend Myron Waters were determined to see that his intent was carried out. They no doubt sponsored the legislation passed for this purpose. The first act is that of April 5, 1862, P. L. 407, consisting of a preamble and 11 sections. The preamble recites the pertinent facts, as detailed above, i.e., the testamentary gift of all the residuary estate of Henry R. Rouse to the county commissioners, "in trust, that the interest thereof should be expended, the one-half for the use of the poor of the County of Warren, and the one-half for the use of the roads of said County"; and that because of doubts as to the validity of said bequest, Samuel D. Rouse, the party entitled to the whole estate under the intestate laws, conveyed all his interest to Myron Waters "in trust" to convey said estate to the county commissioners for the uses and purposes named in the will.

Following this preamble comes the basic fact for decision of the question before the court: creation by law of the entity to which the assets of the Rouse Estate were transferred, the entity which has, ever since, held such funds and kept them invested so that the income

could be used for the purposes named in the will, in spite of invalidity of the testamentary gift. Sections 1 and 2 of the Act of 1862 provide:

"Section 1. Be it enacted by the Senate and House of Representatives of the Commonwealth of Pennsylvania in General Assembly met, and it is hereby enacted by the authority of the same, That the commissioners of the county of Warren, and their successors in office, be and they are hereby made a body corporate, under the name, style and title of Commissioners of the Rouse estate, and by that name to have perpetual succession, and a corporate seal, and to sue and be sued, and hold real and personal estate for the uses and purposes named in the bequest of said Rouse to said commissioners.

"Section 2. That said corporation are hereby authorized to receive from said Myron Waters, his heirs and assigns, at such time as he shall be indemnified, and paid the moneys expended and obligations incurred by him, and his reasonable compensation, a conveyance of the residue of said estate, and to hold the same under the said conveyance, and under said will for the uses and purposes named in said will."

The conveyance made lawful by section 2 was executed. By deed dated November 17, 1863, recorded in Deed Book T at page 603, Myron Waters conveyed to the Commissioners of the Rouse Estate "all the estate, right, title, interest and claim of, in or to the estate of Henry R. Rouse which I claim under the conveyance made to me by Samuel D. Rouse." The habendum clause provides: "To have and to hold to the said party of the second part and their successors forever as fully and perfectly to all intents and purposes as I hold or have held the same under the said deed of conveyance from Samuel D. Rouse."

Section 3 provides that: "The said corporation shall have the power to make sale, in fee simple, of the whole

or any part of the assets conveyed to it by Myron Waters." Section 4 provides: "That said corporation shall have power to make the sales provided for in the preceeding section, upon credit, if deemed advisable, and to receive from the purchasers such securities as may be given, and to hold and collect the same."

Sections 5 and 6 are also basic to the question here involved for they establish the funds coming from the Rouse estate as the corpus of a trust, not to be expended but to be invested and the income to be used for the poor and the roads in the county. They read as follows:

"Section 5. That no portion of the moneys or securities realized from the sale of said estate shall at any time be expended, except the interest thereon, but the same shall be invested by the said commissioners, and secured by judgment, bond and mortgage, upon unincumbered improved real estate in said county, to be taken in the name of the corporation, and bearing interest, payable at such times as may be stipulated for in such bonds and mortgages.

"Section 6. That the interest arising from said estate, from securities that may be taken on the sale thereof, shall be expended by the said corporation for the purposes named in said will, under such regulations as to said commissioners may seem just and equitable."

Investment of Rouse funds is here restricted to first mortgages on improved real estate in Warren County. This is more restrictive than investments allowed, with court approval, for trust funds generally under section 14 of the Act of April 29, 1832, P. L. 190, which includes obligations of the United States, Pennsylvania, or Philadelphia. However, in the court's opinion, such restriction does not indicate that Rouse funds ought to be considered as county funds. The function of the trust for the administration of which the corporation is created is not a county function. The responsibilities

of the county commissioners as county officers is not so interwoven with their responsibilities as Commissioners of the Rouse Estate that the Rouse funds should be considered the same as tax money. The body corporate created by this act is certainly not equivalent to the County of Warren.

Subsequent provisions of the Act of 1862 give some indication that in certain respects the Commissioners of the Rouse Estate are subject to some of the same controls as public officials. Section 7 provides:

"Section 7. That whenever the funds arising from said estate will, in the opinion of said commissioners, justify the same, and whenever the overseers of the poor of the several districts, embracing more than one half of the taxables and taxable property of the county, shall certify to said commissioners the expediency thereof, the said commissioners are authorized to assume the support of the poor of the county of Warren, with the same powers, within the said county, as the overseers of the poor now have in their respective districts; and that from thenceforth the office of overseers of the poor, in said county, shall cease and determine, and that the laws now regulating the support and maintenance of the poor of said county, shall, so far as the same are applicable, govern the said commissioners."

Section 8 requires appointment of a treasurer of the corporation with bond to be approved by the court of common pleas. Section 9 requires the appointment of a clerk to record proceedings of the corporation, to be open to public inspection. Section 10 requires all orders on the treasurer to be signed by at least two commissioners of the Rouse estate and attested by the clerk. Section 11, the final section, comes closest to establishing control of expenditure of income from the Rouse funds in the same manner as expenditure of county tax monies are controlled. It provides:

"Section 11. That it shall be the duty of the county auditors of said county, at the time of auditing the accounts of the treasurer and commissioners of the county, to audit the accounts of the commissioners and treasurer of the corporation, and make report thereof, which said report shall be published, as by law the reports of the county auditors are published."

Under section 11, if the county auditors found that the Rouse funds had been invested in other than first mortgages on county real estate, contrary to section 5, this fact would be noted in the auditor's report. No doubt the Commissioners of the Rouse Estate would have been made to comply with the law and would have been surcharged for any loss to the corporation resulting from such unlawful investments. This system of control of expenditure of the income from the Rouse estate funds by the corporation is no doubt expeditious, and it is still effective. The county auditors have found what they believe to be unlawful investments and they have asked for a declaratory judgment before filing their report. The argument for their position will be discussed after the other Acts of Assembly have been considered.

The next pertinent law passed by the General Assembly is that of April 18, 1864, P. L. 438. This act first provides for the election of three reputable citizens of Warren County, as other county officers are elected, to be Directors of the Rouse Hospital. The term of office was three years, staggered so that one director would be elected each year. They were incorporated as "Rouse Hospital of Warren County" and were empowered to purchase land and construct buildings for accommodations for the poor and the insane of the county, "and do all other things, that overseers of the poor are . . . authorized to do, except in the assessment of taxes, and to receive all such fines, and forfeitures, as by law are now, or shall be, made payable to such

overseers; and said directors are hereby empowered to have, and use, a common seal, in all business relating to said corporation."

Most of the 16 sections of the Act of 1864 set out details for acceptance of and maintenance of poor and indigent persons in the Rouse Hospital. Section 15 provides that the general Poor Laws are to be remain in force in Warren County "substituting the name of this corporation for that of overseers of the poor, in the said several acts of assembly, and the duties, imposed by them, are hereby made applicable to said directors."

Section 4 provides that annual accounts by the directors shall be filed in the office of the county commissioners and "shall be submitted to, adjusted, and settled, by the county auditors, when they settle the accounts of the county officers, and be published with and as they are." Section 11 provides:

"The funds, in the hands of the treasurer of the Rouse estate, applicable to the support of the poor, shall be paid over to the treasurer of the hospital upon orders drawn by the commissioners, as trustees of that estate, based on the estimates of the annual expenses of said institution, furnished as hereinbefore provided; . . ."

The section requiring an estimate of expenses, section 5, also contains the provision on which counsel for the county auditors bases his argument that Rouse estate funds should be regarded as county funds. It reads as follows:

"Section 5. It shall be the duty of the directors, on or before the first of December in each year, to make out, in detail, and furnish to the commissioners of the County, an estimate of the probable expenses of the corporation, for the ensuing year, including the necessary erections, and repairs, salaries, and supplies; whereupon, the said commissioners shall take the necessary measures, to supply the means required, to

defray said expenses; and if the revenues, arising from the Rouse estate, applicable to that purpose, be insufficient, they shall raise the requisite amount, by increasing their assessment for county purposes, sufficiently to meet the demand, and shall pay it over as needed, by orders drawn on the county treasurer."

Section 5 of the Act of 1864 is authority for the deficiency order paid each year to the Commissioners of the Rouse Estate from county institution district funds, that is, from tax monies. The county audit for the year 1959 shows total expenditures of $87,920.33 for operation of the Rouse Hospital, and that $36,-545.20 was furnished from Rouse income and $51,-375.13 from county institution district tax money. The audit shows income in the Rouse Poor Working Fund of only $936.23 from interest on mortgages, and it could therefore be argued that the tail is wagging the dog. Can this change the Rouse trust into the Warren County government? This question will be discussed after the remaining Acts of Assembly pertinent to the Rouse estate have been considered. In this connection, it is worth noting that the tail and the dog will soon be restored to more normal proportions when Rouse capital poor funds are increased by the $100,000 gift of the late Richard M. Haskell.

The Act of 1864 provides for operation of the Rouse Hospital by the directors thereof, but they are not concerned with the investment of Rouse estate funds. Responsibility for investments remains in the Commissioners of the Rouse Estate, incorporated by the Act of 1862, but their authority is enlarged by the final section of the act, which provides:

"Section 16. That the commissioners of the Rouse estate, be and they are hereby authorized to invest any funds, arising from the sale of real estate, in the stocks, or bonds, of the United States, or of the state of Pennsylvania."

This section is important to the issue before the court for it enlarges the investment powers of the Commissioners of the Rouse Estate. They are no longer restricted to mortgages on improved, unincumbered Warren County real estate. By this section their investment powers are made practically the same as the investment powers of guardians, trustees and fiduciaries generally, with court approval, under the Act of March 29, 1832, P. L. 190, sec. 14.

The directors of the Rouse Hospital must have earned the meager pay set by section 12 of the act at two dollars a day for the first 20 days, and one dollar and a half a day thereafter, each year, plus four cents mileage, during the three years of their existence. By 1866, the Rouse Hospital had been erected and was in use. In that year, an act was passed which provided (April 4, 1866, P. L. (1867) 1412) :

"That the office of director of the Rouse Hospital of Warren county be and the same is hereby abolished, and the commissioners of the Rouse estate shall hereafter possess all the powers and privileges and discharge all the duties now, by law, imposed on said directors; and that all acts and parts of acts inconsistent with this, be and the same here hereby repealed."

Thereafter, successive county commissioners, as Commissioners of the Rouse Estate, have not only been responsible for the investment of Rouse estate funds and expenditures of the income for the roads and poor of Warren County, but have been directly responsible for the maintenance and operation of the Rouse Hospital. This situation, which is unique in the Commonwealth of Pennsylvania, has continued for nearly 100 years. The story of Henry Rouse and the trust which he sought to establish and which his father in fact did establish is not widely known, and the county commissioners of other counties have frequently asked: "How is it that the Warren County Commissioners have

money to loan on mortgages?" Of course, the county commissioners, as such, have no money to loan.

Our own residents have speculated as to why the institution ,which would be called a county poor home in any other county, is called a hospital in Warren County. A full explanation involves some very interesting local history but this opinion is no place for such details. Most of the historical highlights are found in the booklet compiled by Hon. W. D. Brown and published in 1907 by the Commissioners of the Rouse Estate as a memorial to Henry R. Rouse. Judge Brown said there that he was then the only person living who was active in the matter. In the 1860's, there was no such thing as a modern hospital where the sick and injured received medical or surgical care. Webster gives the obsolete or historical definition of a hospital as: "A charitable institution for the refuge, maintenance, or education of the needy, aged, infirm, or young persons; as Christ Hospital, London."

The fourth and final act passed in the 1860's, and specifically concerned with the Rouse Estate, is the Act of April 4, 1866, P. L. (1867) 1413, entitled "An Act To exempt the property of the Rouse estate, in the county of Warren, from taxation," which provides, simply: "That the property held by the commissioners of the Rouse estate, in the county of Warren, . . . be and the same is hereby exempted from taxation, except for state purposes." This act was passed before the adoption of the Constitution of 1874 and the legislation authorized by article IX, sec. 1, exempting from taxation institutions of purely public charity. Obviously it was contemplated that "the property held by the Commissioners of the Rouse Estate" might be lawfully subject to local taxation, or the Act of 1866 would not have been passed. Just as obviously it could not have been contemplated that "the body corporate, under the name, style and title of commissioners of the

Rouse estate" was the equivalent of Warren County, or that property held by the Commissioners of the Rouse Estate should be regarded as county owned property. Had such been the case, a law exempting such property from taxation would have been entirely unnecessary.

Chronologically, the next authority cited in support of the argument made by counsel for the county auditors is section 7 of article IX of the Constitution of 1874, which prohibits the general assembly from authorizing any county, city, etc., to become a stockholder in any company, association or corporation, or to obtain or appropriate money for, or to loan its credit to, any corporation, association, institution or individual. This section did not repeal or affect existing laws and therefore could not affect the requirement of section 5 of the Act of 1864, requiring Warren County to make up any deficiency in Rouse estate income, required for operation of the Rouse Hospital. See Indiana County v. The Agricultural Society of Indiana County, 85 Pa. 357 (1877).

The objection in this case is not to the appropriation of tax monies to aid in the operation of the Rouse Hospital, but to the purchase with Rouse estate funds of common stocks which are lawful investments for fiduciaries in general. By section 5 of the Act of 1862, the principal of the Rouse estate was to be held intact and invested in first mortgages on county real estate. Section 16 of the Act of 1864 enlarged the investment powers of the Commissioners of the Rouse Estate to include obligations of the United State of Pennsylvania. Thus their investment powers were virtually the same as the powers of fiduciaries generally except that court approval was not required for investment of Rouse estate funds. This practical equality continued until the passage of the Fiduciaries Act of June 7, 1917, P. L.

447. Under that act, the investment powers of fiduciaries were expanded to include "bonds or other interest bearing obligations of any State or Commonwealth of the United States, or of any County, City, Borough, Township, School District, Institution District, or other political subdivision of any such State or Commonwealth; provided, that the faith and credit of such State, Commonwealth or political subdivision thereof, is pledged for the payment of the principal and interest on said obligation"; and provided the political subdivision is not in default on any of its funded indebtedness. All such investments were made lawful for Rouse estate funds by the Act of April 18, 1929, P. L. 607. This act, and the contention that it violates article IX, sec. 7, of the Constitution of 1874, will be discussed later.

The growing stability of our large industrial corporations made their securities desirable for investment of trust funds but this could not be done until the Constitutional Amendment of 1933. This situation was commented on by Mr. Justice Allen M. Stearne in his opinion in Gillingham Estate, 353 Pa. 493, pages 495-96, as follows:

"From the early history of the Commonwealth this Court has consistently held that in the absence of authority granted by the instrument creating the trust, or by the legislature, fiduciaries are not permitted to invest the trust funds in stocks or bonds of private corporations: Hemphill's Appeal, 18 Pa. 303; Pray's Appeals, 34 Pa. 100; Crane's Estate, 344 Pa. 141, 23 A. 2d 851; Wood's Estate, 130 Pa. Superior Ct. 397, 197 A. 638.

"The Fiduciaries Act of 1917, section 41 (a) 1, 2 and 3, 20 PS sections 801, 804, 805, defines 'legal investments'. They were limited by that act to loans of the United States, the State of Pennsylvania, municipal

corporations of the State, mortgages and ground rents. Such statutory provision did not violate the prohibition of the Constitution of Pennsylvania, Art. 111, section 22, against bonds and stocks of private corporations.

"The commissioners noted that this section of the Fiduciaries Act is a combination of section 14 of the Act of March 29, 1832, P. L. 190, the Act of April 13, 1854, P. L. 368 and section 1 of the Act of May 8, 1876, P. L. 133. They made two significant observations: '. . . the powers of investment granted to fiduciaries under the present law are too greatly restricted and . . . their enlargement would be welcomed throughout the State.' Also that the commissioners would be willing to recommend a more extensive act were it not for the Constitution, which in Art. III, section 22, would seem to prohibit the legislature from authorizing an investment in the bonds or stocks of a private corporation. See Report of the Commission appointed to Codify and Revise the Law of the Decedents' Estates, pages 204, 205.

"On November 7, 1933, Article 111, section 22 of the Constitution was amended so as to read: 'The General Assembly may, from time to time, by law, prescribe the nature and kind of investments for trust funds to be made by executors, administrators, trustees, guardians and other fiduciaries.' Legal investments have since been further defined by the Acts of July 2, 1935, P. L. 545 and May 28, 1937, P. L. 1037, 20 PS 801. Also Act of June 11, 1941, P. L. 101, section 11, 36 PS 654j.

"It should also be noted that when investing in legal securities the fiduciary, nevertheless, is required to exercise common prudence, skill and caution: Restatement, Trusts, Sec. 227, comment (m) ; Scott on Trusts, vol. 2, sec. 227.12. See Taylor's Estate, 277 Pa. 518,

529, 121 A. 310; Casani's Estate, 342 Pa. 468, 470, 21 A. 2d 59."

Amendments to the Fiduciaries Act of 1917 made investments in bonds of railroads, gas, water, electric and telephone companies lawful for trust funds. The amendment of 1947, P. L. 1080, included the bonds and preferred stocks of industrial corporations generally, provided they met certain financial qualifications. The act was repealed by the Fiduciaries Investment Act of 1949, P. L. 1829, 20 PS §821.1 et seq., which also made lawful investments in bonds and preferred stocks of industrial corporations generally, providing they met certain qualifications. Lawful investments were expanded to include common stocks of corporations, meeting certain requirements, by the amendment of August 24, 1951, P. L. 1410, 20 PS §821.9. Amendments in 1953 relaxed some of the financial requirements, and the 1961 amendment supplants the financial qualifications with the "prudent man" rule.

The complaint made by the commission which revised and codified the law in 1917 has been answered with almost reckless abandon. The legal restraints which have irritated professional investment counsel for the past 25 or 30 years have been totally eliminated. Perhaps this was inevitable considering the investment portfolios of our great foundations, our universities, hospitals, churches, libraries, and other endowed eleemosynary institutions. The present law provides:

"Preferred and common stock of any corporation organized under the laws of the United States or of any Commonwealth or State thereof, or of the District of Columbia, shall be an authorized investment if purchased or retained in the exercise of that degree of judgment and care, under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation, but in regard to the per-

manent disposition of their funds, considering the probable income to be derived therefrom as well as the probable safety of their capital."

Does the foregoing law apply to the investment of Rouse estate funds? That is the precise question before the court. Perhaps much of the foregoing is unnecessary in order to answer this question but the court feels it is necessary in view of the position taken by counsel for the county auditors, i.e., that the Act of April 18, 1929, P. L. 607, is unconstitutional as it applies to the Commissioners of the Rouse Estate. This act provides:

"That whenever the commissioners of any county of the seventh class of this Commonwealth have been heretofore, or may hereafter be, incorporated as commissioners or trustees of any real or personal property, the income whereof is to be expended for public purpose or purposes within the county, it shall be lawful for such commissioners to invest and reinvest any moneys realized from the sale of any such property, or from the repayment of any loan, in such securities as are by law made legal investments for funds in the hands of fiduciaries."

If the funds of the Rouse estate must be regarded as "Warren County funds", then the Act of 1929, as it applies to the Commissioners of the Rouse Estate, is in violation of the prohibition of article IX, sec. 7, of the Constitution of 1874. However, the property of Henry R. Rouse was not county property, and the proceeds of his property, of whatever nature they have become or now may be, are not county property. The taxpayers of the county did not contribute to the capital of the Rouse estate nor has the credit of the county nor the county institution district (done away with now that Warren is a sixth class county) ever been pledged in the creation or maintenance of the Rouse estate. Where no county funds are involved and there is no pledging of county credit, the constitutional pro-

hibition does not apply. In Downing v. Erie School District, 297 Pa. 474, the court said, pages 479-80:

"To remedy the evils incident to subscriptions by municipalities to stock of railroads and like enterprises, the constitutional prohibition against purchases of securities, and pledges of credit, was introduced first into the Constitution of 1857, and repeated in that of 1874. The history of this limitation, as well as the purpose intended to be effected thereby, has been the subject of frequent discussion in our cases, and need not be again elaborated on: Com. v. Walton, 182 Pa. 373; Wheeler v. Phila., 77 Pa. 338; Speer v. School Directors, supra. . . ."

The Commissioners of the Rouse Estate are made a body corporate, entirely distinct from Warren County, by the Act of 1862. This is abundantly clear from the fact that the function of the Commissioners of the Rouse Estate under that act and the Act of 1864, as modified by the Act of 1866, was not a county function. This cannot be changed by the fact that the obligations placed on the Commissioners of the Rouse Estate by these acts, which would otherwise have been born by township overseers of the poor, were many years later made obligations of county institution districts. In the court's opinion, this subsequent change in the law only serves to make it completely clear that the Commissioners of the Rouse Estate were never intended to be county officials, nor the Rouse estate funds county funds.

The fact that the accounts of the Commissioners of the Rouse Estate, showing how they have invested and managed the Rouse estate property and expended the income therefrom for the poor and roads in the county, are to be audited by the county auditors, does not make the property acquired from the estate of Henry R. Rouse county property. Investment of the proceeds

from the sale of such property does not involve the tax payers or the credit of Warren County in any way. Such investments, whatever they may be under the changing law, do not involve the evils which the prohibition of article IX, sec. 7, of the Constitution was designed to prevent. If a loss of the Rouse estate resulted from unlawful investments, no doubt the commissioners could be surcharged, but not as county commissioners because no loss of county monies would be involved.

If Henry Rouse had died a pauper or had left his estate to distant relatives, the legal obligation of Warren County would be no heavier than it now is, for the county is now obligated to furnish institutional care for the poor. However, the fact that the Rouse estate funds are held in trust and one-half the income is to be used for maintenance of the poor by direction of the legislature, does not change the nature of the Rouse estate funds. The acts above quoted make it clear that they remain Rouse estate funds, under a trust to be administered by a special corporation created for that purpose, and do not become county funds.

Counsel for the auditors argues that the Act of 1929 would seem to give the county commissioners, indirectly, power which could not be given to them directly because of the constitutional prohibition, that is, power to invest in common stocks. This argument is without merit. The Act of 1929 is not concerned with the powers of county commissioners or the investment of county money. The credit of Warren County is in no way involved by any investments made under the provisions of this act or the Fiduciaries Investment Act or any of its amendments. These acts are not concerned with county funds or the extending of the credit of a county. They do not purport to enlarge or affect the authority of the Warren County Commissioners as county officers. It is suggested that the 1929 Act con-

flicts with the Constitution, but this is not shown to be the fact. Unconstitutionality of a statute must be clearly shown. An act concerning which there is merely a doubt cannot be declared void on this ground: Tranter v. Allegheny County Authority, 316 Pa. 65, 80; Gottschall v. Campbell, 234 Pa. 347, 363.

The final argument in the brief filed by counsel for the county auditors is that the Act of 1862 and the other early acts are repealed by implication under the new County Code. "Implied repeals are not favored by the law": Scott v. Bell, Secretary of Banking, 344 Pa. 243, 246. The Act of 1862 created a corporation to act as trustee of the residuary estate of Henry Rouse; that property which passed to Henry's father under the intestate laws, was conveyed by him to Myron Waters, and by Waters to the corporation so that the invalid provisions of Henry's will could be carried out. The Rouse funds are not county property. The County Code in no way refers to Rouse funds.

The trust cannot be terminated by reason of the fact that the law subsequently placed on the county the responsibility for indigents needing institutional care. For a good history of the Poor Laws, see Poor District Case (No. 1), 329 Pa. 390. Such a theory would do away with all charitable trusts. Nor would the trust fail, in the court's opinion, if the Act of 1862 should be repealed. A charitable trust will not fail for want of a trustee or a workable scheme of management. This rule was clearly stated by the court in Mear's Estate, 299 Pa. 217, pages 321-22, where the court said:

"The Act of May 3, 1855, P. L. 415, provides for this contingency, by empowering the courts 'to supply a trustee, and by its decrees to carry into effect the intent of the donor or testator, so far as the same can be ascertained.' This remedy, was by no means a new one in 1855. Before that period it was held in Mann v. Mullin, 34 Pa. 297, to be a clear and established rule that a

charitable trust should not fail for lack of a trustee. Charities have always been favorites of the law in Pennsylvania and the Act of 1855 provides remedies which seem to make it impossible that a charity should fail through defects in the scheme of management. Daly's Est., 208 Pa. 58, 66." In Daly's Estate, supra, the court said: "Assuming that the whole scheme of management should fail, the charitable use will not be permitted to fail." (page 66.)

The records of the Commissioners of the Rouse Estate will show that Rouse funds have been invested in Warren County mortgages for many years. The commissioners were required to examine county real estate, determine its value, and decide how much could safely be loaned on a first mortgage. Investments in common stocks on advice of professional investment counsel demonstrates a rather startling change in policy. There is a flavor of absentee landlord about holding common stock of Southern California-Edison Corporation rather than mortgages on Warren County homes. That, however, is a matter of policy with which the court is not concerned. Investments which are lawful for fiduciaries are lawful for Commissioners of the Rouse Estate.

For the foregoing reasons, the court makes the following:

## Decree

And now, May 2, 1962, for the reasons stated in the foregoing opinion, it is hereby ordered, adjudged and decreed that it is lawful for the Commissioners of the Rouse Estate to invest the permanent capital fund of the Rouse estate in such securities as are by law made legal investments for funds in the hands of fiduciaries. The costs of this proceeding are to be paid from Rouse estate funds.